Liza M. Walsh
Mariel L. Belanger
Jessica K. Formichella
Lauren R. Malakoff
**WALSH PIZZI O'REILLY FALANGA LLP**
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, New Jersey 07102
(973) 757-1100

*Attorneys for Defendant/Counterclaimant
Pfizer Inc.*

William P. Deni, Jr.
J. Brugh Lower
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

*Attorneys for Defendant/Counterclaimant
BioNTech SE*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ARBUTUS BIOPHARMA CORP. and GENEVANT SCIENCES GMBH,<br><br>                    Plaintiffs/Counterclaim Defendants,<br><br>    v.<br><br>PFIZER INC. and BIONTECH SE,<br><br>                    Defendants/Counterclaimants. | Civil Action No. 23-1876 (ZNQ) (TJB) |

## DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND .................................................................................................. 3

    A.    Lipid Nanoparticles............................................................................. 3

    B.    Lipid Particle Manufacturing ............................................................. 5

III.   THE PATENTS-IN-SUIT .................................................................................. 5

    A.    The Encapsulation Patents .................................................................. 6

    B.    The Molar Ratio Patents ..................................................................... 7

IV.   APPLICABLE LEGAL STANDARDS ............................................................ 9

V.    DISPUTED CLAIM TERMS ........................................................................... 10

    A.    "vesicle" ............................................................................................. 10

    B.    "fully encapsulated" .......................................................................... 15

        1.    Molar Ratio Patents............................................................... 16

        2.    Encapsulation Patent ............................................................. 18

    C.    "a cationic lipid comprising from 50 mol % to 65 mol % of the total lipid present in the particle" ......................................................... 19

    D.    "the cholesterol or derivative thereof comprises from 30 mol % to 40 mol % of the total lipid present in the particle" .......................................... 24

    E.    "consisting essentially of" .................................................................. 25

VI.   CONCLUSION .................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Actelion Pharms., Ltd. v. Sun Pharm. Indus., Inc.*,
   No. 17-cv-5015, 2019 WL 653149 (D.N.J. Feb. 15, 2019) ....................................................20

*Actelion Pharms. Ltd. v. Mylan Pharms. Inc.*,
   85 F.4th 1167 (Fed. Cir. 2023) ....................................................................................23, 24

*Actelion Pharms. Ltd. v. Mylan Pharms. Inc.*,
   No. 1:20-CV-110, 2023 WL 11804879 (N.D.W. Va. Dec. 13, 2023)....................................24

*ACTV, Inc. v. Walt Disney Co.*,
   346 F.3d 1082 (Fed. Cir. 2003)..........................................................................................12

*AK Steel Corp. v. Sollac*,
   344 F.3d 1234 (Fed. Cir. 2003)............................................................25, 26, 27, 28, 29

*Alpex Computer Corp. v. Nintendo Co.*,
   102 F.3d 1214 (Fed. Cir. 1996)..........................................................................................24

*Arbutus et al. v. Moderna, Inc. et al.*,
   No. 22-CV-252-MSG, ECF No. 266 (D. Del. April 3, 2024) ...........................................3, 24

*Astrazeneca AB, Aktiebolaget Hassle, KBI-E, Inc. v. Mut. Pharm. Co.*,
   384 F.3d 1333 (Fed. Cir. 2004)..........................................................................................13

*AstraZeneca AB v. Mylan Pharms. Inc.*,
   19 F.4th 1325 (Fed. Cir. 2021) ....................................................................................22, 23

*Cobalt Boats, LLC v. Brunswick Corp.*,
   773 F. App'x 611 (Fed. Cir. 2019) ....................................................................................19

*Doorking, Inc. v. Sentex Systems, Inc.*,
   19 Fed. Appx. 872 (Fed Cir. 2001)....................................................................................17

*Dow Chemical Co. v. Nova Chemicals Corp. (Canada)*,
   803 F.3d 620, 634-35 (Fed. Cir. 2015) ..............................................................................18

*Horizon Pharma Ireland Ltd. v. Actavis Labs.*,
   Civil No. 14-7992, 2016 WL 4408990 (D.N.J. Aug. 7, 2016) ........................................26, 28

*HZNP Meds. LLC v. Actavis Labs. UT, Inc.*,
   940 F.3d 680 (Fed. Cir. 2019)......................................................................25, 26, 27

*Int'l Bus. Machines Corp. v. Iancu*,
   759 F. App'x 1002 (Fed. Cir. 2019) ..................................................................................11

# TABLE OF AUTHORITIES
## (continued)

**Cases**                                                                 **Page(s)**

*Intel Corp. v. Qualcomm, Inc.*,
   21 F.4th 801 (Fed Cir. 2021) .................................................................16

*Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*,
   302 F.3d 1352 (Fed. Cir. 2002).........................................................11, 15

*Jeneric/Pentron, Inc. v. Dillon Co.*,
   205 F.3d 1377 (Fed. Cir. 2000).................................................................19

*L'Oréal S.A. v. Johnson & Johnson Consumer Cos.*,
   No. 12-cv-98, ECF No. 183 (D. Del. Nov. 5, 2014).................................26, 27, 28

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) (en banc)......................................................10

*Martek Bioscis. Corp. v. Nutrinova, Inc.*,
   579 F.3d 1363 (Fed. Cir. 2009).................................................................27

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*,
   395 F.3d 1364 (Fed. Cir. 2005).................................................................14

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
   133 F.3d 1473 (Fed. Cir. 1998)...................................................................9

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003).................................................................18

*Pall Corp. v. Hemasure Inc.*,
   181 F.3d 1305 (Fed. Cir. 1999).................................................................17

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc).................................6, 9, 10, 12, 20, 29

*PPG Indus. v. Guardian Indus. Corp.*,
   156 F.3d 1351 (Fed. Cir. 1998).................................................................25

*Prostrakan, Inc. v. Actavis Lab'ys UT, Inc.*,
   No. 2-16-CV-0044-RWS-RSP, 2017 WL 3028876, (E.D. Tex. July 15, 2017)....................26

*Renishaw PLC v. Marposs Societa' Per Azioni*,
   158 F.3d 1243 (Fed. Cir. 1998).................................................................14

*San Rocco Therapeutics, LLC v. Bluebird Bio, Inc.*,
   No. CV 21-1478-RGA, 2024 WL 2747111 (D. Del. May 29, 2024) .........................9

# TABLE OF AUTHORITIES
### (continued)

**Cases**                                                                    **Page(s)**

*Sinorgchem Co., Shandong v. ITC,*
    511 F.3d 1132 (Fed. Cir. 2007)...............................................................................16

*South Corp. v. United States,*
    690 F.2d 1368 (Fed. Cir. 1982) (en banc).............................................................2

*Speedtrack, Inc. v. Amazon,*
    998 F.3d 1373 (Fed. Cir. 2021)...............................................................................24

*Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.,*
    743 F.3d 1359 (Fed. Cir. 2014)...............................................................................20

*Thorner v. Sony Computer Entertainment America LLC,*
    669 F.3d 1362 (Fed. Cir. 2012)...............................................................................14

*United States v. Nichols Copper Co.,*
    29 C.C.P.A. 186 (C.C.P.A. 1941)...........................................................................12

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)..................................................................................9

**Rules**

Rule 4.1(a)........................................................................................................................10

## TABLE OF EXHIBITS

**Exhibits**                                                                 **Page(s)**

Ex. A    U.S. Patent No. 9,504,651 to MacLachlan, Lipid compositions for nucleic acid delivery ................................................................................................................6

Ex. B    U.S. Patent No. 11,298,320 to MacLachlan, Liposomal apparatus and manufacturing methods ...........................................................................................6

Ex. C    U.S. Patent No. 11,318,098 to MacLachlan, Liposomal apparatus and manufacturing methods ...........................................................................................6

Ex. D    U.S. Patent No. 8,492,359 to Yaworski, Lipid formulations for nucleic acid delivery ................................................................................................................7

Ex. E    U.S. Patent No. 11,141,378 to Yaworski, Lipid formulations for nucleic acid delivery ................................................................................................................7

Ex. 1    H. Hauser & G. Poupart, *Lipid Structure, in* THE STRUCTURE OF BIOLOGICAL MEMBRANES (P. Yeagle ed., 1992)............................................3

Ex. 2    S. C. Semple *et al.*, *Lipid-Based Formulations Of Antisense Oligonucleotides For Systemic Delivery Applications*, 313 Methods in Enzymology 322 (2000) ...........4

Ex. 3    S. Batzri & E.D. Korn, *Single bilayer liposomes prepared without sonication*, 298 Biochim. Biophys. Acta 1015 (1973) ......................................................................4

Ex. 4    P. Cullis *et al.*, *Generating and loading of liposomal systems for drug-delivery applications*, 3 Advanced Drug Delivery Reviews 267 (1989)..............................4

Ex. 5    T. J. McIntosh, *The effect of cholesterol on the structure of phophatidylcholine bilayers*, 513 Biochim. Biophys. Acta 43 (1978) ....................................................4

Ex. 6    U.S. Pub. No. 2004/0032037 to Katinger, Method and Device for Producing Lipid Vesicles ..........................................................................................................4, 5

Ex. 7    A. Abuchowski *et al.*, *Effect of covalent attachment of polyethylene glycol on immunogenicity and circulating life of bovine liver catalase*, 252 J. Biol. Chem. 3582 (1977)..........................................................................................................4

Ex. 8    P. L. Felgner *et al.*, Lipofection: *A highly efficient, lipid-mediated DNA-transfection procedure*, 84 Proc. Natl. Acad. Sci. U.S.A. 7413 (1987)..................4

Ex. 9    International Publication No. WO 1998/051278 to Semple, High Efficiency Encapsulation of Charged Therapeutic Agents in Lipid Vesicles ..........................4

Ex. 10   S. C. Semple *et al.*, *Efficient Encapsulation of Antisense Oligonucleotides in Lipid Vesicles Using Ionizable Aminolipids: Formation of Novel Small Multilamellar Vesicle Structures* 1510 Biochim. Biophys. Acta 152 (2001) ..................4, 5, 6, 16

## TABLE OF EXHIBITS
### (continued)

**Exhibit**                                                                 **Page(s)**

Ex. 11    U.S. Patent No. 6,734,171 to Saravolac, Methods for Encapsulating Nucleic Acids in Lipid Bilayers ............................................................................................4, 6

Ex. 12    U.S. Pub. No. 2006/0134189 to MacLachlan, siRNA Silencing of Apolipoprotein B .............................................................................................................................4, 5

Ex. 13    J. J. Wheeler *et al*., *Stabilized plasmid-lipid particles: construction and characterization*, 6 Gene Therapy 271 (1999)............................................5, 14, 16

Ex. 14    J. Szebeni *et al*., *Insights into the Structure of Comirnaty Covid-19 Vaccine: A Theory on Soft, Partially Bilayer-Covered Nanoparticles with Hydrogen Bond-Stabilized mRNA−Lipid Complexes*, 17 ACS Nano 13147 (2023) ......................5

Ex. 15    M. E. Hayes *et al*., *Assembly of nucleic acid-lipid nanoparticles from aqueous-organic monophases*, 1758 Biochim. Biophys. Acta 429 (2006)...........................5

Ex. 16    N. Maurer et al., *Spontaneous Entrapment of Polynucleotides upon Electrostatic Interaction with Ethanol-Destabilized Cationic Liposomes*, 80 Biophys. J. 2310 (2001)..............................................................................................................5, 16

Ex. 17    E. G. Saravolac et al., *Encapsulation of Plasmid DNA in Stabilized Plasmid-Lipid Particles Composed of Different Cationic Lipid Concentration for Optimal Transfection Activity*. 7 J. Drug Target. 423 (2000) ................................................5

Ex. 18    S. F. Alino *et al*., *Pharmacokinetics of oligodeoxynucleotides encapsulated in liposomes: effect of lipid composition and preparation method*, 29 XENOBIOTICA 1283 (1999)............................................................................5, 16

Ex. 19    December 14, 2015 Amendment and Request for Consideration and December 7, 2015 Heyes Declaration ...........................................................................................7

Ex. 20    L. Schoenmaker *et al*., *mRNA-lipid nanoparticle COVID-19 vaccines: Structure and stability*, Int. J. Pharm. 601 International Journal of Pharmaceutics 1 (2021)  8

Ex. 21    E-mail from S. Kung to Plaintiffs (February 15, 2024)  ......................................10

Ex. 22    Plaintiffs Proposed Terms for Construction (February 15, 2024)  ......................10

Ex. 23    *Vesicle*, The New American Oxford Dictionary, Oxford University Press, (2001)...................................................................................................................12

Ex. 24    August 11, 2011 Amendment and Request for Consideration ......................21, 25

Ex. 25    E-mail from S. Kung to Plaintiffs (March 4, 2024)..............................................30

Ex. 26    E-mail from S. Kung to Plaintiffs (March 29, 2024)............................................30

## I.    __INTRODUCTION__

This case involves Comirnaty®, the world's first messenger RNA ("mRNA") vaccine approved by the FDA against COVID-19.  Defendants BioNTech SE and Pfizer Inc. (collectively, "Defendants") developed Comirnaty®.  Following decades of research into mRNA technology, BioNTech designed the mRNA active ingredient in Comirnaty®.  The formulation of Comirnaty® uses lipids and lipid nanoparticle technology invented, patented, and licensed by a third-party, Acuitas Therapeutics, Inc.  Plaintiffs Arbutus Biopharma Corporation and Genevant Sciences GmbH (collectively, "Plaintiffs") have asserted patents in an attempt to reap the rewards of work they did not perform and technology they did not invent.  Plaintiffs advance constructions that are contrary to the patent specifications and prosecution history; Defendants propose constructions that are properly grounded in the intrinsic record and should be adopted.

**Vesicle**:  Plaintiffs propose that "vesicle" be construed to mean "a composition that can be used to deliver a compound," whereas Defendants propose "a sac containing an aqueous interior or a relatively disordered lipid mixture."  Plaintiffs' construction, on its face, is not a meaning of "vesicle."  Rather, Plaintiffs improperly base their construction on a fragment of the express definition of the claim term "lipid vesicle."  Plaintiffs' attempt to assert lexicography by relying on a mere fragment of text fails to meet the standard of requiring a clear change from the plain and ordinary meaning.  Defendants, on the other hand, base their construction on the entire express definition of "lipid vesicle," which includes explanatory examples of vesicles and accords with the plain meaning of the term "vesicle" as well as its usage in the specification.

**Fully Encapsulated**:  Plaintiffs propose to construe the term "fully encapsulated" as "contained within," whereas Defendants propose "the active agent or therapeutic agent in the lipid particle is not significantly degraded after exposure to serum or a nuclease or protease assay that would significantly degrade free DNA, RNA, or protein."  Defendants' construction is based on

1

the meaning set forth in Plaintiffs' own patent specification and is required because that phrase would otherwise be susceptible to different and conflicting meanings. Now, in a litigation-driven about-face, Plaintiffs seek to avoid their own patent text. In addition to disregarding their own definitional language in the patent specification, and furthering indefiniteness (which is to be decided subsequently), Plaintiffs also fail to give meaning to all words used in the claim language.

**Cationic and Cholesterol Molar Ratios**: Certain claims recite numerical ranges of molar ratios of a cationic lipid ("50 to 65%") and cholesterol or its derivative ("30 to 40%"). Plaintiffs propose that these numerical ranges be construed to encompass "standard variation based on the number of significant figures recited in the claim," whereas Defendants propose that the numerical endpoints be construed as the strict numerical boundaries to each range. These ranges draw lines in the sand, without language of approximation. The absence of such language denotes a strict numerical boundary, especially when, as here, the applicant struck language of approximation ("about") during prosecution to "narrow" the ranges and obtain their allowance over the prior art. There is no intrinsic evidence that allows the claims to encompass values that are not actually the numbers claimed, but merely round up or down to them. This Court should therefore enforce the precise numerical endpoints literally recited by claims.

**Consisting Essentially Of**: After keeping patent applications pending for years, Plaintiffs more recently obtained and have asserted a particular patent that use the special transitional phrase, "consisting essentially of." "Consisting essentially of" connotes that an accused product can include subject matter not specifically identified in the claim so long as it does not materially affect the "basic and novel properties" of the invention. As a result, the Court must engage in claim construction to ascertain those "basic and novel properties" from the patent specification. Plaintiffs improperly make no effort to identify those properties; instead, they incorrectly propose

that the term means that a particle may include unrecited ingredients that do not "materially affect the combination and concentration of the lipid components."  But that is just redundant of the legal test and a generic re-statement of the claim—not the "basic and novel properties of the invention," which are the properties that distinguish the prior art or demonstrate surprising results. Defendants' construction identifies from the specification the basic and novel properties of the invention that the patent describes as a surprising discovery superior to the prior art:  namely, increased activity of the encapsulated nucleic acid, improved tolerability of the formulations *in vivo*, significant increase in therapeutic index, and stability compared to lipid particles having less than 50 mol % cationic lipid.  Defendants' construction is both correct and the only one proposed to the Court that identifies the "basic and novel properties."[1]

## II.    BACKGROUND

### A.    Lipid Nanoparticles

Lipid nanoparticles ("LNPs") are microscopic particles consisting of lipids.[2]  Lipid nanoparticles were developed—over the course of several decades—to serve as a package for

---

[1] In a case not involving Defendants that does not bind this Court, another district court construed certain of these claim terms.  *Arbutus et al. v. Moderna, Inc. et al.*, No. 22-CV-252-MSG (D. Del. April 3, 2024) (ECF No. 266).  Specifically, the court (1) rejected Plaintiffs' construction of "fully encapsulated" for U.S. Patent No. 9,504,651, and (2) adopted Plaintiff's construction of molar ratio claim terms as permitting rounding based on rejecting a prosecution disclaimer argument that is not raised here.  The district court did not construe the claim term "vesicle," the "fully encapsulated" claim term of U.S. Patent Nos. 8,492,359 and 11,141,378, or the "consisting essentially of" claim term of U.S. Patent No. 11,141,378.  Further, the record and arguments in these proceedings are not the same.

[2] Lipids are a diverse group of organic compounds that are primarily composed of carbon, hydrogen, and oxygen atoms.  They are hydrophobic (*i.e.*, insoluble in water) or amphipathic (*i.e.*, contain both hydrophobic and hydrophilic regions).  (Ex. 1 at 3.)  All Exhibits are attached to the declaration of Simon F. Kung, filed herewith.

delivering an active agent ("cargo" or "payload"), such as a nucleic acid,[3] to a cell. (Ex. 2 at 331-41 (2000).) An overview of the development leading to modern LNPs is set forth below.

Early lipid-based particles emerged in the 1960s and were termed "liposomes." These particles used "phospholipids" and formed bilayer vesicles surrounding an aqueous core containing an active ingredient. (Ex. 3 at 1015-19.) Researchers subsequently enhanced liposome performance by diversifying the lipid components and improving methods of manufacturing. (Ex. 4 at 268-70; Ex. 2 at 326-27.) For example, including the lipid cholesterol increased stability in the particles. (Ex. 4 at 276; Ex. 5 at 43; Ex. 6 at [0047].) Similarly, incorporating polyethylene glycol-containing lipids, or "PEG-lipids," enhanced particle stability and drug bioavailability. (Ex. 7 at 3582; Ex. 6 at [0047].) In 1987, it was discovered that incorporating a positively charged lipid (a "cationic lipid") in a lipid-nucleic acid formulation helped increase cellular uptake of the nucleic acid. (Ex. 8 at 7413.) Thus, well before the 2002 filing date of the earliest Asserted Patents, the published literature showed persons of ordinary skill in the art that these four basic lipid components (*i.e.*, phospholipid, cholesterol, a PEG-lipid, and cationic lipid) were used for effective delivery. (Ex. 9 at 14:7-20:31, 33:1-64:14; Ex. 10 at 154; Ex. 11 at 12:8-33:8.)

Subsequent research into lipid particles having the four basic components showed that certain changes to the relative percentages, or "molar ratios," of the four components impacted performance. (*E.g.*, Ex. 12 at [0351] (disclosing a "'2:40:10' (DSPC:Cholesterol:PEG-C-DMA:DLinDMA, 10:48:2:40% molar composition).) By 2008, ranges of molar ratios that could result in delivery were known. For example, Ex. 12 discloses approximate mol % ranges for the

---

[3] Nucleic acids (such as DNA and RNA) are polymers containing at least two nucleotides, which are the basic building blocks of genes. Nucleic acids are also referred to as oligonucleotides.

cationic lipid (2 to 60%), non-cationic lipid (30 to 70%, 40 to 60%, or 48%), PEG-lipid (0.5 to 20%, 1.5 to 18%, or 2%), and cholesterol (20 to 55%). (Ex. 12 at [0152].)

### B. Lipid Particle Manufacturing

By 2001, it was also shown that lipid formulations of nucleic acids can be formed by combining an aqueous solution including a nucleic acid and an organic lipid solution. (Ex. 10 at 154; Ex. 6 at [0022], [0027], [0045], [0046].) When a solution containing the four lipid components described above (a phospholipid, cholesterol, a PEG-lipid, and a cationic lipid) is mixed with a nucleic-acid solution, the lipids and nucleic acids self-assemble into particles of lipids and nucleic acids. *Id.*

The self-assembly process occurs through natural forces and is not precise. Some nucleic acids remain free-floating within the mixture of particles, some stick to the exterior of a particle, some may protrude from particles, and some may be entirely within the particle. (Ex. 13 at 273-74; Ex. 10 at 154, 158-59; Ex. 14 at 13151; Ex. 15 at 433.) The degree of encapsulation of the nucleic acid can indicate the effectiveness of the manufacturing process. But there is no one measurement for the degree of encapsulation of nucleic acids. Encapsulation could refer to, among other things, the measurement of the percentage of the starting nucleic acids that are encapsulated, the measurement of the amount of nucleic acids in the final mixture that are inside a particle versus outside (either before or after unencapsulated nucleic acids are removed), or the ratio of lipids to nucleic acid in the final mixture. (Ex. 16 at 2311-12, 2317-18; Ex. 10 at 154; Ex. 17 at 426; Ex. 18 at 1285.) Each of these measurements can be made using a variety of scientific techniques, including chromatography, nucleic acid degradation, or fluorescent dyes. (*Id.*)

## III.    THE PATENTS-IN-SUIT

The five patents-in-suit fall into two patent families. The patents within each patent family share the same inventors, specifications, and relevant priority dates.

A.    **The Encapsulation Patents**[4]

Plaintiffs first filed an application leading to the asserted Encapsulation Patents on June 28, 2002.  Plaintiffs have kept applications pending in this family for years, obtaining patents over a decade after filing the applications.  As a result, when considering the later-drafted claim language, it is essential to closely inspect the patent specification to understand what the alleged invention was at the time of filing.[5]  The '651 patent issued in 2016 and claims a "lipid vesicle formulation" comprising a cationic lipid, an amphipathic lipid (such as phospholipid), and a PEG-lipid, and mRNA, "wherein at least 70% of the mRNA in the formulation is fully encapsulated in the lipid vesicles."  '651 patent at claim 1 (disputed terms highlighted), claim 2 (dependent claim specifying that the amphipathic lipid is a phospholipid).

As noted above, formulations comprising these three lipid ingredients were disclosed in the prior art, including before June 2002.  (*E.g.*, Ex. 10 at 154; Ex. 11 at 12:8-33:8.)  Although the claims of the '651 patent recite that the lipid vesicle formulation includes mRNA, the patent specification shows no work by the inventors using mRNA.  Instead, when the application was filed in 2002, the putative inventors were using only "plasmid DNA."  '651 patent at 14:10-18:61.  In fact, the specification lacks a single example of any lipid formulation containing mRNA.  *Id.*  The Applicant obtained claims covering mRNA by relying on the sole reference to "mRNA" in the specification, where it appears in a simple list of all of the major types of RNA known at the time:  "RNA may be in the form of oligonucleotide RNA, tRNA (transfer RNA), snRNA (small nuclear RNA), rRNA (ribosomal RNA), mRNA (messenger RNA), antisense RNA, siRNA (small

---

[4] U.S. Patent Nos. 9,504,651 ("the '651 patent") (Ex. A), 11,298,320 ("the '320 patent") (Ex. B), and 11,318,098 ("the '098 patent") (Ex. C).

[5] *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) ("In light of the statutory directive that the inventor provide a 'full' and 'exact' description of the claimed invention, the specification necessarily informs the proper construction of the claims.").

interfering RNA), ribozymes, chimeric sequences, or derivatives of these groups." '651 patent at 3:66-4:3.

Even though the inventors never disclose making and using an mRNA formulation, Plaintiffs claim formulations wherein "at least 70% of the mRNA in the formulation is fully encapsulated in the lipid vesicles." This claim limitation was first added in 2015—some 13 years after the application was filed. (Ex. 19.) The specification does not use the phrase "fully encapsulated" anywhere, let alone explain what it means for an mRNA to be fully encapsulated in a lipid formulation.

After the '651 patent issued, Plaintiffs kept applications having the same patent specification pending in the family, filing the '320 and '098 patents in May 2021, after Comirnaty® was already on the market. They claim apparatuses and processes "for producing a lipid vesicle encapsulating a nucleic acid within the lipid vesicle," rather than the vesicles themselves. *See, e.g.*, '320 patent at claims 1, 18; '098 patent at claims 1, 18.

### B.    The Molar Ratio Patents[6]

Plaintiffs also maintained a patent family pending from an application filed on April 15, 2008, obtaining the '359 patent in 2013 and the '378 patent in 2021. The '359 and '378 patents have the same specification. The alleged invention of the '359 patent, as discussed in the patent specification, is specific ranges of the cationic lipid, phospholipid, PEG-lipid, and cholesterol components. '359 patent at 3:19-64. The nucleic acids made and used by the inventors in these patents are "small interfering RNA" (also known as "siRNA"), which is a form of RNA that is

---

[6] U.S. Patent Nos. 8,492,359 ("the '359 patent") (Ex. D) and 11,141,378 ("the '378 patent") (Ex. E).

different from mRNA as used in Comirnaty®.[7]  '359 patent at 68:20-86:67.  The specification explains that certain ranges, including specific ranges for the cationic lipid, provide advantages for the RNA formulations:

> ***The present invention is based, in part, upon the surprising discovery that lipid particles comprising from about 50 mol % to about 85 mol % of a cationic lipid***, from about 13 mol % to about 49.5 mol % of a non-cationic lipid, and from about 0.5 mol % to about 2 mol % of a lipid conjugate ***provide advantages when used for the in vitro or in vivo delivery of an active agent, such as a therapeutic nucleic acid (e.g., an interfering RNA)***.

'359 patent at 5:50-61 (emphases added); *see also* '378 patent at 6:6-13 (same).  Consistent with this description, every single example of the alleged invention is a formulation that comprises at least 50 mol % cationic lipid.  '359 patent at 68:20-85:67;'378 patent at 70:1-88:9.  And for each of these formulations, the nucleic acid is siRNA.  *Id.*

The '359 patent claims a "nucleic acid-lipid particle" having a nucleic acid, "a cationic lipid comprising from 50 mol % to 65 mol % of the total lipid present in the particle," a non-cationic lipid including "cholesterol or a derivative thereof [that] comprises from 30 mol% to 40 mol % of the total lipid present in the particle," and a specified conjugated lipid.  '359 patent at claim 1 (disputed terms highlighted).

After details surrounding Comirnaty® had been made public, in April 2021, Plaintiffs filed the application that gave rise to the '378 patent, which issued in October 2021.[8]  In these claims, Plaintiffs expressly specified percentage amounts of the phospholipids, cholesterol, and PEG-lipid, but remained silent on the percent of cationic lipid (though the amount would necessarily be

---

[7] siRNA is a type of RNA that disables gene expression by binding to and degrading the mRNA associated with a particular gene.  siRNA is typically smaller than mRNA and is double-stranded rather than single-stranded.  '359 patent at 1:36-48.

[8] Details of Comirnaty®'s formulation were disclosed publicly in its Package Insert and an April 9, 2021 article that described its lipid components and their molar ratios.  (Ex. 20 at 3.)

constrained because other ingredients were required).  In obtaining the '378 patent, unlike the earlier patents, Plaintiffs obtained allowance for a narrower claim form that uses the transitional word "consisting essentially of" before the list of materials:

> **1**. A nucleic acid-lipid particle consisting essentially of:
> (a) an RNA;
> (b) a cationic lipid having a protonatable tertiary amine;
> (c) a mixture of a phospholipid and cholesterol of from 30 mol % to 55 mol % of the total lipid present in the particle, wherein the phospholipid consists of from 3 mol % to 15 mol % of the total lipid present in the particle; and
> (d) a polyethyleneglycol (PEG)-lipid conjugate consisting of from 0.1 mol % to 2 mol % of the total lipid present in the particle.

'378 patent at claim 1 (disputed term highlighted).  Plaintiffs secured a quick allowance of the application in view of the history of the previous allowances in the same patent family (discussed below in Section V.C.).

## IV.    APPLICABLE LEGAL STANDARDS

Claim construction is "a question of law." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1330 (Fed. Cir. 2005) (en banc).  "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312.  "[T]he words of a claim 'are generally given their ordinary and customary meaning,'" which is the "meaning that the term would have to a [POSA] at the time of the invention." *Id.* at 1312-13.  "The claims, of course, do not stand alone," but rather, they "must be read in view of the specification." *Id.* at 1315.  "The best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history." *Id.* (citing *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998).)  Indeed, usually, the specification "is dispositive," as it is "the single best guide to the meaning of the disputed term." *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

The "intrinsic" record governing claim construction also includes the prosecution history, which "consists of the complete record of the proceedings before the [Patent Office]." *Id.* at 1317. The prosecution history "provides evidence of how the [Patent Office] and the inventor understood the patent," and it "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention." *Id.*

The Court may also examine "extrinsic" evidence, which includes "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc). However, extrinsic evidence must not be used for "the purpose of varying or contradicting the terms of the claims." *Id.* at 981. "The district court's claim construction, enlightened by such extrinsic evidence as may be helpful, is still based upon the patent and prosecution history." *Id.*; *accord Phillips*, 415 F.3d at 1316 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."). Extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317.

## V.    **DISPUTED CLAIM TERMS**

### A.    **"vesicle"[9]**

| Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| "vesicle" | "lipid vesicle" means "a lipid composition that can be used to deliver a compound" | "vesicle" means "a sac containing an aqueous interior or a relatively disordered lipid mixture" |

---

[9] In Defendants' February 15, 2024 Local Patent Rule 4.1(a) disclosure, Defendants specifically identified the term "vesicle" for construction. (Ex. 21). For this same exchange, Plaintiffs stated that "all of the asserted claim terms of the Asserted Patents have plain and ordinary meanings." (Ex. 22). Only after seeing Defendants' proposed construction have Plaintiffs sought to argue that all claim terms identified by Defendants have a meaning other than their plain and ordinary meaning. Plaintiffs waived their attempts to propose any construction departing from the plain and ordinary meaning. This further supports rejecting Plaintiffs' current construction.

| | Alternatively, "vesicle" means "a composition that can be used to deliver a compound" | |
|---|---|---|

The asserted claims of the Encapsulation Patents recite a "lipid vesicle" encapsulating a nucleic acid. *See* '651 patent at claim 1; '320 patent at claims 1, 18; '098 patent at claims 1, 18. In a lengthy sentence (quoted in full below), the specification expressly defines "lipid vesicle." The dispute concerns the meaning of the term "vesicle" in that express definition. Plaintiffs ask this Court to adopt just a fragment of this sentence. Defendants, by contrast, ask the Court to construe the term "vesicle" in light of the entire express definition of "lipid vesicle," which is consistent with the plain meaning of the term.

In particular, the patent states what "lipid vesicle" generally refers to, and then gives three examples of "lipid vesicles" that have specific features in common with each other and the disclosures of the patent:

> "Lipid vesicle" refers to any lipid composition that can be used to deliver a compound including, but not limited to, liposomes, wherein an aqueous volume is encapsulated by an amphipathic lipid bilayer; or wherein the lipids coat an interior comprising a large molecular component, such as a plasmid, with a reduced aqueous interior; or lipid aggregates or micelles, wherein the encapsulated component is contained within a relatively disordered lipid mixture.

'651 patent at 5:30-37. "Where, as here, the patentee has clearly defined a claim term, that definition usually . . . is dispositive; it is the single best guide to the meaning of a disputed term." *Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1360-61 (Fed. Cir. 2002).

In construing "vesicle," Plaintiffs propose that the Court rely on only the first clause of the definition and ignore the examples that the applicant deemed critical enough to incorporate into that definition. That is improper. By listing these examples of "lipid vesicles," the inventors informed a POSA regarding the meaning of "vesicle." *Int'l Bus. Machines Corp. v. Iancu*, 759 F. App'x 1002, 1007 (Fed. Cir. 2019) (list starting with "such as" indicated that "only things of a

type similar to the itemized ones are covered") (non-precedential); *United States v. Nichols Copper Co.*, 29 C.C.P.A. 186, 191 (C.C.P.A. 1941) (same).[10]  Those examples confirm that a vesicle is not any "composition," as Plaintiffs' proposed construction would allow, but it is a sac structure encapsulating, coating, or containing the interior containing the compound.  Specifically, in the examples the Applicant describes (1) a liposome in which an aqueous volume is "encapsulated" by an amphipathic lipid bilayer; (2) a liposome wherein the lipids "coat" a plasmid with a reduced aqueous anterior; and (3) lipid aggregates or micelles in which the interior component is "encapsulated" and "contained within a relatively disordered mixture."  '651 patent at 5:32-37. The functions described in these examples imply a structure, namely a sac (or similar structure) capable of encapsulating an interior component.  The definitional examples convey to person of ordinary skill in the art at the priority date that the term "vesicle" is used in its ordinary sense of that word, which is a "bladder, sac, cyst, or vacuole" that envelops a fluid.  (Ex. 23 (defining vesicle as "a small fluid-filled bladder, sac, cyst, or vacuole within the body").)

The surrounding language of the claims confirms this meaning of "vesicle."  Claim terms are not considered in isolation, for "the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those claims."  *Phillips*, 415 F.3d at 1314 (quoting *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003)).  Here, the independent claims recite "at least 70% of the mRNA in the formulation is *fully encapsulated* in the lipid vesicles," '651 patent at claim 1 (emphasis added), or an apparatus for producing "a lipid vesicle *encapsulating* a nucleic acid within the lipid vesicle," '320 patent at claims 1, 18; '098 patent at claims 1, 18 (emphasis added).  A person of ordinary skill in the art would

---

[10] The decisions of the Court of Customs and Patent Appeals constitute binding precedent of the Court of Appeals for the Federal Circuit.  *South Corp. v. United States*, 690 F.2d 1368, 1369 (Fed. Cir. 1982) (en banc).

understand from this context that the vesicle is, consistent with its ordinary meaning and patent specification, a sac encapsulating a nucleic acid.  *See* '651 patent at 5:30-37.

Further, all of the exemplary embodiments comport with Defendants' definition of the term.  *Id.* at 14:9-19:3.  The examples, for instance, describe how to make an "SPLP," which is defined as "represent[ing] a vesicle of lipids coating an interior comprising a nucleic acid such as a plasmid with a reduced aqueous interior," which is consistent with Defendants' construction.  '651 patent at 5:41-44; 14:13-15; 15:21-25.  "[W]hile it is of course improper to limit the claims to the particular preferred embodiments described in the specification, the patentee's choice of preferred embodiments can shed light on the intended scope of the claims."  *See Astrazeneca AB, Aktiebolaget Hassle, KBI-E, Inc. v. Mut. Pharm. Co.*, 384 F.3d 1333, 1340 (Fed. Cir. 2004).

Other parts of the specification confirm that, when the inventors used the term "vesicle," they refer not to a generic composition, but rather a sac structure capable of encapsulating an interior component that was well-known in the prior art as of 2002.  For example, in discussing the many systems "already known" for administering active substances into cells, the patent describes "[l]iposomes with multiple bilayers [that] are known as multilamellar lipid vesicles," in which "fluids entrapped between layers are only released as each membrane degrades," and "[l]iposomes with a single bilayer that are known as unilamellar lipid vesicles (UV).  '651 patent at 1:27-31.  After reiterating the different types of vesicles previously described, the patent declares that "[t]hose of skill in the art will know of other lipid vesicles for which the processes and apparatus of the present invention will be suitable."  *Id.* at 6:59-62.  Indeed, the prior art illustrates the sac structure of vesicles:



(Ex. 13 at 277) (depicting a "vesicle containing encapsulated plasmid").

Plaintiffs attempt to wrench one phrase from the definition of "lipid vesicle"—"any lipid composition that can be used to deliver a compound"—and disregard the rest. Plaintiffs thus attempt to define the term "vesicle" purely in terms of a generic delivery function, even though the term as a matter of plain meaning and as used in the definitional examples connotes a structure, namely a sac capable of encapsulating an interior component. To the extent Plaintiffs defend their construction as special lexicography departing from the plain meaning of "vesicle," this is incorrect. "When a patentee acts as his own lexicographer in redefining the meaning of particular claim terms *away from their ordinary meaning*, he must clearly express that intent in the written description," with "sufficient clarity to put one reasonably skilled in the art *on notice that the inventor intended to redefine the claim term*." *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005) (even where the specification uses definitional language of "means," the patentee failed "to justify . . . a counterintuitive definition" of the claim term) (emphases added); *Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning.'"); *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998) ("the patentee's lexicography must, of course, appear with reasonable clarity, deliberateness, and precision before it can affect the claim") (citation omitted). The patentee has not done so here. Rather, the patent's express definition of "lipid vesicle" incorporates the plain meaning of vesicle, as the definitional examples confirm.

14

This Court should reject Plaintiffs' attempt to broaden the meaning of "vesicle" beyond its plain meaning into any composition capable of delivering a compound, regardless of structure, based on a fragment of an express definition.

The Court should therefore adopt Defendants' construction of "vesicle," which is the construction that comports with the intrinsic and extrinsic evidence. In the alternative, the Court should adopt the full definition of "lipid vesicle" that appears in the patents, not just the misleading fragment Plaintiffs propose.

**B.      "fully encapsulated"**

| Term | Plaintiffs' Construction | Defendants' Construction[11] |
|---|---|---|
| Fully encapsulated | "contained inside" | **Molar Ratio Patents:** "the active agent or therapeutic agent in the lipid particle is not significantly degraded after exposure to serum or a nuclease or protease assay that would significantly degrade free DNA, RNA, or protein"<br><br>**Encapsulation Patent ('651 patent)**: Indefinite |

To construe the claim term "fully encapsulated," Defendants rely on the lexicography that appears in the Molar Ratio Patents, which is dispositive. *Jack Guttman, Inc.*, 302 F.3d at 1360-61. Plaintiffs, by contrast, ignore that lexicography and try to expand the scope of their patents by construing this term more broadly than the express definition as meaning merely "contained inside" the lipid vesicle.

---

[11] As explained below, the two different constructions proposed by Defendants reflect differences in the specifications of the Molar Ratio and Encapsulation Patents.

1.     **Molar Ratio Patents**

The Molar Ratio Patents expressly define the claim phrase "fully encapsulated" in terms of the measured degradation of the active agent in the lipid particle.  The patents state:

> The term "fully encapsulated" indicates that the active agent or therapeutic agent in the lipid particle is not significantly degraded after exposure to serum or a nuclease or protease assay that would significantly degrade free DNA, RNA, or protein.

'359 patent at 23:7-10; *see also* '378 patent at 23:52-55.  The patents further specify the Oligreen® assay as the method for "determin[ing] full encapsulation of nucleic acid therapeutic agents" by measuring the extent of degradation.  '359 patent at 23:16-19; *see also* '378 patent at 23:61-65.

This passage constitutes lexicography, especially given that there are multiple differing methods for determining encapsulation.  (Ex. 13 at 279-80; Ex. 10 at 154; Ex. 16 at 2311-12, 2317-18; Ex. 18 at 1285.)  Where, as here, "the specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term."  *Sinorgchem Co., Shandong v. ITC*, 511 F.3d 1132, 1138 (Fed. Cir. 2007) (citation omitted).  The hallmarks of lexicography, *e.g.,* setting off the phrase in quotation marks, are present.  *Id.* at 1136.  The passage defines what constitutes full encapsulation and specifies the method for measuring it.  Thus, "fully encapsulated" means that the agent is enclosed in the lipid vesicle such that "the active agent or therapeutic agent in the lipid particle is not significantly degraded after exposure to serum or a nuclease or protease assay that would significantly degrade free DNA, RNA, or protein."  '359 patent at 23:7-10.

Plaintiffs' contrary construction of "contained inside" is inadequate, for multiple reasons.  First, Plaintiffs' definition disregards the lexicography of the Molar Ratio Patents.  Second, it fails to account for "fully," which is a modifier for encapsulation.  Third, a court should "strive to capture the scope of the actual invention, rather than . . . allow the claim language to become

divorced from what the specification conveys is the invention," *Intel Corp. v. Qualcomm, Inc.*, 21 F.4th 801, 809 (Fed Cir. 2021), and should avoid "unduly broad" constructions of claim terms, *Pall Corp. v. Hemasure Inc.*, 181 F.3d 1305, 1310 (Fed. Cir. 1999). *See also Doorking, Inc. v. Sentex Systems, Inc.*, 19 Fed. Appx. 872, 877 (Fed Cir. 2001) (rejecting "a broad interpretation of" a claim term).

The phrase "contained inside" is not equivalent to (and thus not a proper construction of) "fully encapsulated." Just because an "encapsulated component" may be "contained inside" a lipid particle (though the meaning of "contained inside" is itself unclear), that does not make "encapsulated" and "contained inside" synonymous. Plaintiffs fail to account for the very purpose of the disclosed lipid particle, which is to physically protect the therapeutic agent from the bloodstream. As the specification explains, "[a] gene delivery system containing an encapsulated nucleic acid for systemic delivery … should remain intact in the circulation for an extended period of time in order to achieve delivery to affected tissues." '378 patent at 2:53-57. Accordingly, "[i]n the lipid particle of the invention, . . . the active agent or therapeutic agent may be encapsulated in the lipid, *thereby protecting* the agent from enzymatic degradation." *Id.* at 11:45-50 (emphasis added), 23:30-33 (same); 3:29-33 ("the active agent or therapeutic agent is fully encapsulated within the lipid portion of the lipid particle such that the active agent or therapeutic agent in the lipid particle is resistant in aqueous solution to enzymatic degradation …."). Plaintiff's construction fails to capture the structural capability of protecting the active agent from enzymatic degradation of the disclosed particles that "fully encapsulated" connotes.

Plaintiffs' construction also provides insufficient guidance for the parties during the remainder of fact discovery and expert discovery. As evidenced by how Plaintiffs described this term in the '359 and '378 patents—*i.e.*, based on whether the lipid particle is "significantly

degraded after exposure to serum or a nuclease or protease assay that would significantly degrade free DNA, RNA, or protein," '359 patent at 23:7-10; *see also* '378 patent at 23:52-55—the term "fully encapsulated" reflects the outcome of a measurement.  Without information on what the proper measurement should be, the parties lack guidance on whether there is infringement and what prior art applies.

### 2.    Encapsulation Patent

The claims of the '651 patent recite the term "fully encapsulated," but, unlike the Molar Ratio Patents, the '651 patent does not explain what is meant by that term.  Absent an express definition, Defendants maintain that the term is indefinite and incapable of construction.  Defendants assert that there are multiple methods for determining encapsulation, and different methods yield different results, rendering the claim indefinite.  *Dow Chemical Co. v. Nova Chemicals Corp. (Canada)*, 803 F.3d 620, 634-35 (Fed. Cir. 2015).  This Court has directed that indefiniteness will be resolved later in this case.  *See* May 6, 2024 Order, ECF No. 70.

Plaintiffs' construction of "contained inside" should be rejected for the reasons discussed in the previous subsection.  *See supra* at V.B.1.  If the Court were inclined to construe the term now, the construction should be the same as the definition from the Molar Ratio Patents, *i.e.*, "the active agent or therapeutic agent in the lipid particle is not significantly degraded after exposure to serum or a nuclease or protease assay that would significantly degrade free DNA, RNA, or protein."  *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) (the same construction should generally attach to the same claim term in related patents).

### C.    "a cationic lipid comprising from 50 mol % to 65 mol % of the total lipid present in the particle"

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| a cationic lipid comprising from 50 mol % to 65 mol % of the total lipid present in the particle | Plain and ordinary meaning, i.e., "a cationic lipid comprising from 50 mol % to 65 mol % of the total lipid present in the particle";<br><br>The recited mol % ranges are understood to encompass their standard variation based on the number of significant figures recited in the claim. | "an amount of cationic lipid that is no less than 50% and no more than 65% of the total lipid present in the particle" |

The '359 patent claims "a nucleic acid-lipid particle" comprising, among other things, "a cationic lipid comprising from 50 mol % to 65 mol % of the total lipid present in the particle." '359 patent at claim 1.  Plaintiffs, having amended their claims to recite a numerically precise range, are now trying to reclaim surrendered claim scope by construing that precise range to include supposed "standard variation based on the number of significant figures."  This Court should reject this entreaty, and should treat the range endpoints as written (*i.e*, as numerical boundaries).  Thus, this claim phrase should be construed as "an amount of cationic lipid that is no less than 50% and no more than 65% of the total lipid present in the particle."

When confronted with exact ranges without words of broadening, courts apply the endpoints as strict numerical boundaries. *Jeneric/Pentron, Inc. v. Dillon Co.*, 205 F.3d 1377 (Fed. Cir. 2000) ("Without broadening words that ordinarily receive some leeway, the precise weight ranges of claim 1 do not avoid a strict numerical boundary to the specified parameter."); *Cobalt Boats, LLC v. Brunswick Corp.*, 773 F. App'x 611, 616 (Fed. Cir. 2019) ("Where a precise value is included in the claim without a term such as 'about,' we interpret the claim language as imposing a strict numerical boundary, absent evidence that such a construction would be inconsistent with the intrinsic evidence").  This principle applies here. The inventors eschewed words of broadening. The claims recite a cationic-lipid range "comprising from 50 mol % to 65 mol % of the total lipid

present in the particle"—not "**about** 50 mol % to **about** 65 mol % of the total lipid present in the particle." '359 patent at claim 1.

Furthermore, the inventors here knew how to claim ranges with approximation, but chose not to do so in claim 1. Other claims do use broadening language in describing cationic-lipid molar ratios. *See Phillips*, 415 F.3d at 1314 ("Other claims of the patent in question, both asserted and unasserted, can . . . be valuable sources of enlightenment as to the meaning of a claim term."). Unlike claim 1, claim 19 of the same patent qualifies the cationic-lipid range using the word "about." *Id*. at claim 19 ("The nucleic acid-lipid particle of claim 14, wherein the nucleic acid-lipid particle comprises ***about 55 mol %*** cationic lipid") (emphasis added). In *Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359 (Fed. Cir. 2014), the Federal Circuit construed the claim term 400 µm without "about" language to be a precise value because inclusion of "about" in other claim terms showed that the "inventors knew how to express ambiguity in claim language when they so desired." *Id.* at 1364-65. So too here, the claim should be construed to reflect the inventor's chosen words.

The prosecution history likewise supports Defendants' construction. It shows that the omission of broadening language was a deliberate attempt to narrow the claims to overcome prior art. During previous prosecution of an application in the same family, the Applicant originally filed claims that included the language of approximation, reciting a cationic-lipid range of "about 50 mol % to about 65 mol %."[12] The Applicant surrendered formulations comprising a cationic lipid with less than 50 mol %, and narrowed the claims, ***by affirmatively removing the term***

---

[12] The amendments were made during prosecution of U.S. Patent No. 8,058,069 ("the '069 patent"). The '359 patent was filed as a continuation of the '069 patent and recites the same molar amounts of cationic lipid and cholesterol. The surrendering of claim scope in ancestor patent applications applies to later-filed patents in the family. *Actelion Pharms., Ltd. v. Sun Pharm. Indus., Inc.*, No. 17-cv-5015, 2019 WL 653149, at *6 (D.N.J. Feb. 15, 2019).

"*about*" from the claims, *i.e.*, from "about 50 mol % to about 65 mol %" to overcome the examiner's prior art rejections and arguing this made the claims more "narrow":

**Amendments to the Claims:**

This listing of claims will replace all prior versions, and listings of claims in the application:

**Listing of Claims:**

1.     1.     (Currently amended)  A nucleic acid-lipid particle comprising:
2.     (a) a nucleic acid;
3.     (b) a cationic lipid comprising from ~~about~~ 50 mol % to ~~about~~ 65 mol % of the
4.          total lipid present in the particle;
5.     (c) a non-cationic lipid comprising a mixture of a phospholipid and cholesterol or
6.          a derivative thereof, wherein the phospholipid comprises from ~~about~~ 4 mol %
7.          to ~~about~~ 10 mol % of the total lipid present in the particle and the cholesterol
8.          or derivative thereof comprises from ~~about~~ 30 mol % to ~~about~~ 40 mol % of
9.          the total lipid present in the particle; and
10.    (d) a conjugated lipid that inhibits aggregation of particles comprising from ~~about~~
11.         0.5 mol % to ~~about~~ 2 mol % of the total lipid present in the particle.

(Ex. 24 at 2 (affirmatively removing "about") (highlighting added).)   The Applicant expressly explained and characterized this removal of "about" as an amendment to "narrow" the claimed cationic-lipid range to avoid the prior art (U.S. Pub. No. 2006/0008910), namely "2-60, 5-**50**, 10-45, 30 mol %."

Applicants provide a comparison of the ranges of lipid components between claim 1 as amended and the lipid ranges of MacLachlan *et al.* as quoted by the Examiner:

| Lipid Component | Claim 1 as Amended | US 2006/0008910* |
|---|---|---|
| Cationic Lipid | 50-65 mol % | "2-60, 5-50, 10-45, 20-40, 30 mol%" |
| Phospholipid | 4-10 mol % | "5-90 mol%" |
| Cholesterol | 30-40 mol % | "20-55 mol %" |
| Conjugated Lipid | 0.5-2 mol % | "1-20 mol %" |

*The ranges set forth in this column are reproduced from page 4 of the Office Action mailed May 12, 2011.

Applicants respectfully point out that claim 1 as presently amended recites narrow ranges for each of the lipid components compared to the substantially broader ranges taught by MacLachlan *et al.* Thus, per M.P.E.P. 2131.03 (II), it is reasonable to conclude that the claimed narrow ranges are not disclosed with "sufficient specificity" to constitute an anticipation of claim 1 and its dependent claims. *See, e.g., Atofina*, wherein the Federal Circuit held: (1) a reference

*Id.* at 8 (highlighting added).   In other words, the Applicant made the affirmative decision to be bound to values within the specified range of "50-65 mol %" (instead of ***about 50 mol % to*** about 65 mol %, as previously pursued) so as to cover a "narrow range[]" and avoid the disclosed ranges in the prior art.   By removing the word "about" before the numerical value, Plaintiffs conveyed that the ranges had strict numerical boundaries and excluded rounding.   The numerical range, by

itself, did not indicate rounding before the removal of the word "about" and still does not after the Applicant amended their claims.  The broader phrasing of "about" was never reinserted into the claims, including when the Applicant filed the application leading to the '359 patent.

During prosecution, the Applicant also referred to exact endpoints of the cationic-lipid range in characterizing the alleged invention as surprising.  The Applicant alleged that "SNALP formulations having increased amounts of cationic lipid, *e.g.*, one or more cationic lipids comprising from 50 mol % to 65 mol % of the total lipid present in the particle, provide *unexpectedly superior advantages*":

> As discussed above, the Examiner found the comparative data set forth in the instant specification to be sufficient to overcome all of the obviousness-type double patenting rejections of record. In particular, Applicants reiterate that it is clear from the specification that the present invention is based, in part, on the surprising discovery that 1:57 SNALP formulations provide **new and unexpected results** when used for the *in vitro* or *in vivo* delivery of an active agent, such as a therapeutic nucleic acid (*e.g.*, an interfering RNA).  In fact, Applicants have found that SNALP formulations having increased amounts of cationic lipid, *e.g.*, one or more cationic lipids comprising from 50 mol % to 65 mol % of the total lipid present in the particle, provide *unexpectedly superior advantages* when used for the *in vitro* or *in vivo* delivery of an active agent, such as a therapeutic nucleic acid (*e.g.*, an interfering RNA).

*Id.* at 9 (underlying, bolding, and italics in the original) (highlighting added).  The Applicant repeated this same argument on the next page, noting that, "as set forth in the instant specification and acknowledged by the Examiner, SNALP formulations having increased amounts of cationic lipid . . . provide *unexpectedly superior advantages* over previously exemplified SNALP formulations containing lower amounts of cationic lipid."  *Id.* at 10 (underlining, bolding, and italics in the original) (highlighting added).  This emphasis on using increased amounts of cationic lipid with the lower limit set to "50 mol %"—an exact number without broadening words—is further evidence that Plaintiffs did not intend to allow for rounding in the claims.  The Patent Office allowed the application only after the Applicant made these amendments and arguments.

The Federal Circuit has rejected rounding under similar circumstances.  In *AstraZeneca AB v. Mylan Pharms. Inc.*, 19 F.4th 1325 (Fed. Cir. 2021), the Court determined that the claimed

concentration of an ingredient (PVP) as 0.001% w/w should not be rounded.  Among other reasons, the Court noted that "[o]ver the course of the prosecution history, the inventors narrowed the claimed concentration of PVP to 0.001% w/w from a broader range without using the qualifier 'about,'" while emphasizing that this concentration was critical to stability.  *Id.* at 1333.  And the Court added that "importantly, the prosecution history shows that the inventors knew how to claim ranges or describe numbers with approximation, *e.g.*, by using the term "about" to qualify the amount of PVP claimed. Yet, in the asserted claims, the inventors chose to claim exactly 0.001% w/w PVP. Under our precedent, this provides further support for construing 0.001% narrowly." *Id.* at 1333-34.  The Court observed, "the public should reasonably be able to rely on these amendments and arguments in the prosecution history to inform the scope of the claimed invention."  *Id.* at 1334.  So, too, here the inventors narrowed the claimed range by omitting the term "about," even though they used such language in other claims.  And likewise the public should be able to rely on the prosecution history and claim amendments as corroborating the claim's plain meaning of a range with precise endpoints.

The intrinsic evidence is decisive here.  The Federal Circuit has recently clarified that there is no "bright-line rule" applicable in all cases "that the lack of approximation language, even when it may be found elsewhere in the claims, dictates a precise value" and forecloses rounding. *Actelion Pharms. Ltd. v. Mylan Pharms. Inc.*, 85 F.4th 1167, 1171 (Fed. Cir. 2023).  But in that case, "the prosecution history d[id] not provide clarity" as to whether the inventor intended claim an exact range because the claims did not change in precision during prosecution, *id*. at 1173, and therefore the court remanded the case to the district court to consider extrinsic evidence, *id.* at

1174.[13]  Here, by contrast, the prosecution history does provide clarity as to whether the Applicant intended to claim an exact range—the Applicant clearly intended to do so to overcome specific prior art.  *Alpex Computer Corp. v. Nintendo Co.*, 102 F.3d 1214, 1220 (Fed. Cir. 1996).[14]

Accordingly, because the intrinsic evidence demonstrates that the Applicant intended to claim a range bounded by the stated numbers, no rounding should be permitted.

### D.    "the cholesterol or derivative thereof comprises from 30 mol % to 40 mol % of the total lipid present in the particle"

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| the cholesterol or derivative thereof comprises from 30 mol % to 40 mol % of the total lipid present in the particle | Plain and ordinary meaning, i.e., "the cholesterol or derivative thereof comprises from 30 mol % to 40 mol % of the total lipid present in the particle"; <br><br> The recited mol % ranges are understood to encompass their standard variation based on the number of significant figures recited in the claim | an amount of cholesterol or derivative thereof that is no less than 30% and no more than 40% of the total lipid present in the particle |

The claim language expressly and unambiguously requires "the cholesterol or derivative thereof" be within the range of "30 mol % to 40 mol % of the total lipid present in the particle." '359 patent at claim 1.  Like the cationic-lipid term discussed *supra* at Section V.C, the claim uses

---

[13]  *AstraZeneca* continues to be good law even after *Actelion*.  *See Actelion*, 85 F.4th at 1170, 1172-73 (leaving intact the holdings from *AstraZeneca* and, instead, distinguishing the decision based on the specific facts presented in the case).  Indeed, the district court on remand in *Actelion* gave the claim a very narrow interpretation of "pH of 13 or higher" to 12.98 to 13.02. *Actelion Pharms. Ltd. v. Mylan Pharms. Inc.*, No. 1:20-cv-110, 2023 WL 11804879, at *11 (N.D.W. Va. Dec. 13, 2023).

[14]  This Court need not find disclaimer to adopt Defendants' construction because it is based on the express language of the claims.  However, the Applicants' clear and unequivocal amendments and arguments would reflect a disclaimer of a broader scope.  *Speedtrack, Inc. v. Amazon*, 998 F.3d 1373, 1377, 1379 (Fed. Cir. 2021); *but see Arbutus et al. v. Moderna, Inc. et al.*, No. 22-CV-252-MSG (D. Del. April 3, 2024) (ECF No. 266).

precise molar ratios without broadening language, and the original language of "about 30 mol% to about 40%" was amended to exclude the "about" modifiers.

**Amendments to the Claims:**

This listing of claims will replace all prior versions, and listings of claims in the application:

**Listing of Claims:**

1.    (Currently amended)  A nucleic acid-lipid particle comprising:

(a) a nucleic acid;

(b) a cationic lipid comprising from about 50 mol % to about 65 mol % of the total lipid present in the particle;

(c) a non-cationic lipid comprising a mixture of a phospholipid and cholesterol or a derivative thereof, wherein the phospholipid comprises from about 4 mol % to about 10 mol % of the total lipid present in the particle and the cholesterol or derivative thereof comprises from about 30 mol % to about 40 mol % of the total lipid present in the particle; and

(d) a conjugated lipid that inhibits aggregation of particles comprising from about 0.5 mol % to about 2 mol % of the total lipid present in the particle.

(Ex. 24 at 2.)  The claimed range, therefore, should be construed as numerical endpoints not subject to rounding.

###    E.    "consisting essentially of"

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| Consisting essentially of | Plain and ordinary meaning, i.e., "consisting of only the listed ingredients and those that do not materially affect the combination and concentration of the lipid components" | Indefinite. The purported "basic and novel properties," according to the patent, include: increased activity of the encapsulated nucleic acid, improved tolerability of the formulations in vivo, significant increase in therapeutic index, and stable, compared to lipid particles having less than 50 mol % cationic lipid. |

When used in the preamble of a patent claim, the term "consisting essentially of" means that the claimed invention "includes the listed ingredients but is open to unlisted ingredients that do not materially affect the basic and novel properties of the invention."  *HZNP Meds. LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 692-93 (Fed. Cir. 2019) (citation omitted); *see also AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1239 (Fed. Cir. 2003).  "A 'consisting essentially of' claim

occupies a middle ground between closed claims that are written in a 'consisting of' format and fully open claims that are drafted in a 'comprising' format." *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1354 (Fed. Cir. 1998) (citation omitted).

The basic and novel properties of the invention are determined from the intrinsic evidence (typically, the specification). *AK Steel*, 344 F.3d at 1239-40. Those properties are "the goal of the invention" and that which "distinguishes it [(*i.e.*, the invention)] from the prior art." *Id.*; *see also HZNP*, 940 F.3d at 695-96 (analyzing "basic and novel properties" under the same rubric). Basic and novel properties also include characteristics that demonstrate "improvement over the prior art" and, therefore, "sufficient[ly]" qualify as "the basic and novel properties of the claimed invention." *Horizon Pharma Ireland Ltd. v. Actavis Labs.*, Civil No. 14-7992, 2016 WL 4408990, at *8 (D.N.J. Aug. 7, 2016) (Hillman, J.). And, the basic and novel properties are properties that "ha[ve] been found to be remarkable" and "surprisingly good." *Prostrakan, Inc. v. Actavis Lab'ys UT, Inc.*, No. 2-16-CV-0044-RWS-RSP, 2017 WL 3028876, at *5–8 (E.D. Tex. July 15, 2017); *L'Oréal S.A. v. Johnson & Johnson Consumer Cos.*, No. 12-cv-98, ECF No. 196, slip op. at 1 n.2 (D. Del. Nov. 5, 2014) (description in the specification that "[t]he Applicant has discovered" an "exceptional" property, which "was surprisingly obtained" qualified as the basic and novel property).

Plaintiffs never address the "basic and novel properties" of the alleged invention. Instead, they ask the Court to construe the term to mean "consisting of only the listed ingredients and those that do not materially affect the combination and concentration of the lipid components." That is circular reasoning that does not provide any guidance. The combination and concentration of lipid components are claim *elements*, not the basic and novel *properties of the invention*. This Court must construe the specification as part of claim construction to determine those properties, and whether the specification discloses components that would affect those properties and thus are

26

excluded.  Here, the basic and novel properties of the invention are the increased activity of the encapsulated nucleic acid, improved tolerability of the formulations in vivo, significant increase in therapeutic index, and stability compared to lipid particles having less than 50 mol % cationic lipid, and the phrase "consisting essentially of" excludes lower molar concentrations.

### 1.    Determining "the basic and novel properties of the invention" is a matter of claim construction

The first step in determining the meaning of the phrase "consisting essentially of" is ascertaining what, specifically, are the "basic and novel properties of the invention."  *AK Steel*, 344 F.3d at 1239-40; *see also L'Oréal*, No. 12-cv-98, ECF No. 196, slip op. at 1 n.2 ("As with claim construction, the court determines the basic and novel properties of an invention as a matter of law, while resorting to the same sources of evidence as used for claim construction.") (citing *Martek Biosis. Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1373 (Fed. Cir. 2009) and *AK Steel*, 344 F.3d at 1239-40).  In *Horizon Pharma*, this Court assessed the basic and novel properties at the claim construction stage, which procedure was affirmed by the Federal Circuit.  Civil No. 14-7992, 2016 WL 4408990, at *8 (D.N.J. Aug. 7, 2016) (Hillman, J.), *aff'd*, *HZNP*, 940 F.3d at 680.

### 2.    Defendants' construction identifies "the basic and novel properties of the invention"

The specification here clearly identifies the basic and novel properties of the invention.  *AK Steel*, 344 F.3d at 1239-40 ("To determine those [basic and novel] properties, we need look no further than the patent specification.").  Those properties are, as compared to formulations having less than 50 mol % cationic lipid:  (1) "increased activity of the encapsulated nucleic acid"; (2) "improved tolerability of the formulations in vivo"; (3) "significant increase in therapeutic index"; and (4) "stability in circulation."  This is made clear in the "Detailed Description of the Invention," which discusses the "surprising discovery" that the "present invention" of formulations comprising "about 50 mol %" cationic lipids impart those advantageous properties.

27

> ***The present invention*** is based, in part, ***upon the surprising discovery*** that lipid particles comprising ***from about 50 mol % to about 85 mol % of a cationic lipid***, from about 13 mol % to about 49.5 mol % of a non-cationic lipid, and from about 0.5 mol % to about 2 mol % of a lipid conjugate provide advantages when used for the in vitro or in vivo delivery of an active agent, such as a therapeutic nucleic acid (e.g., an interfering RNA). In particular, as illustrated by the Examples herein, ***the present invention*** provides stable nucleic acid-lipid particles (SNALP) ***that advantageously impart*** *increased activity of the encapsulated nucleic acid* (e.g., an interfering RNA such as siRNA) and *improved tolerability of the formulations in vivo*, resulting in a *significant increase in the therapeutic index* as compared to nucleic acid-lipid particle compositions previously described. Additionally, the SNALP of the invention are *stable in circulation*, e.g., resistant to degradation by nucleases in serum, and are substantially non-toxic to mammals such as humans.

'378 patent at 6:1-24 (emphases and color added). These surprising properties—as captured by Defendants' proposed construction of the "basic and novel properties"— are allegedly "the goal of the invention" and that which "distinguishes it from the prior art." *AK Steel*, 344 F.3d at 1239-40; *L'Oréal*, No. 12-cv-98, ECF No. 196, slip op. at 1 n.2 (D. Del. Nov. 5, 2014).

**3.** **The claim should be construed to exclude cationic lipids below 50 mol % because such a low molar concentration would affect the basic and novel properties of the invention**

In cases where courts ascertain the basic and novel properties associated with the term "consisting essentially of," the court may also determine from the intrinsic evidence what materially affects those basic and novel properties as a matter of claim construction. *See AK Steel*, 344 F.3d at 1240-41.

In *AK Steel*, the Federal Circuit recognized that the determination of what unspecified subject matter "materially affects" "the basic and novel properties" is "a matter of claim construction," and not a jury question, if "the specification directly speaks to and conclusively answers that question." *Id.* at 1240. The claims in *AK Steel* were directed to stainless steel with a coating metal "consisting essentially of aluminum." *Id.* at 1237. The Court first analyzed what were the basic and novel properties of the invention. The Court held that "[]the specification clearly states that good wetting is the goal of the invention as well as what distinguishes it from

the prior art," and further made clear that more than 0.5% silicon in a metallic coating would interfere with good wetting. *Id.* at 1239-40. Based on the specification, the Court "conclude[d] that silicon in excess of 0.5% by weight would materially alter the basic and novel properties of the invention, and that the claims of the '135 patent must therefore be interpreted to permit no more than 0.5% silicon by weight in the aluminum coating." *Id.* at 1240; *see also San Rocco Therapeutics, LLC v. Bluebird Bio, Inc.,* No. CV 21-1478-RGA, 2024 WL 2747111, at *3 (D. Del. May 29, 2024) (interpreting "consists essentially of" based on "language the Applicants used during patent prosecution").

As in *AK Steel*, this Court may determine what unlisted features, if present, materially affect the basic and novel properties of the invention and thus are excluded from the claim. Here, the '378 patent explains that "the present invention" comprising "from about 50 mol %" cationic lipid[15] is what achieved "the surprising discovery" that such formulations have advantages over the prior art. '378 patent at 6:6-13. Following *AK Steel,* this Court should likewise conclude that amounts of cationic lipid that are less than 50 mol %, according to the patent, materially alter the basic and novel properties of the invention. The basic and novel properties of the claims of the '378 patent must therefore be interpreted to permit no less than 50 mol % cationic lipid. Although the issue need not be reached with a proper construction of "consisting essentially of," the specification is unequivocal enough to disclaim lower concentrations. *Phillips*, 415 F.3d at 1316.

### 4.    Plaintiffs Give the Court No Legitimate Alternative Construction

Defendants placed Plaintiffs on notice that they should identify the basic and novel properties to the extent they disagreed with Defendants' construction. Specifically, on March 4,

---

[15] Claim 1 of the '378 Patent does not specify the molar concentration of the cationic lipid, although it does specify them for other lipids, and although other patent claims in the family (*e.g.*, '359 patent claim 1; '069 patent claim 1) do specify the cationic-lipid molar concentration.

2024, Defendants notified Plaintiffs that their forthcoming L. Pat. R. 4.2 Exchange of Preliminary Claim Constructions and Extrinsic Evidence should provide "their construction of 'consisting essentially of,' including a construction that identifies the basic and novel properties of the claimed invention." (Ex. 25.) After receiving Plaintiffs' proposed construction on March 21, 2024, Defendants advised Plaintiffs on March 29, 2024, that Defendants will seek preclusion of any assertion of basic and novel properties other than what Plaintiffs disclosed. (Ex. 26.)

Having full notice, Plaintiffs proposed only "plain and ordinary meaning, i.e., consisting of only the listed ingredients and those that do not materially affect the combination and concentration of the lipid components." But simply generically identifying the claimed *elements* (such as, for example, "the combination and concentration of the lipid components," as proposed by Plaintiffs) does not identify the "basic and novel properties" of an invention. Nor would a POSA know what "materially affects the combination and concentration of the lipid components," as Plaintiffs are proposing. Plaintiffs' proposal is an effort at diversion: Plaintiffs wish to avoid a construction of "consisting essentially of" so that the claim scope is, effectively, as broad as an open-ended "comprising" claim. Having chosen to use this form of transitional phrase, however, Plaintiffs must now accept that an appropriate construction of this needs to be applied in evaluating infringement and invalidity. The only construction offered, and the one which is supported by the intrinsic record, is the one proposed by Defendants.

## VI.   **CONCLUSION**

Defendants respectfully request that this Court adopt Defendants' proposed construction for each of the disputed claim terms.

30

Dated: June 19, 2024

s/ Liza M. Walsh
Liza M. Walsh
Mariel L. Belanger
Jessica K. Formichella
Lauren R. Malakoff
**WALSH PIZZI O'REILLY FALANGA LLP**
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, New Jersey 07102
(973) 757-1100
lwalsh@walsh.law
mbelanger@walsh.law
jformichella@walsh.law
lmalakoff@walsh.law

OF COUNSEL:

Sara Tonnies Horton (*pro hac vice*)
**WILLKIE FARR & GALLAGHER LLP**
300 North LaSalle Drive
Chicago, Illinois 60654
(312) 728-9040


Michael W. Johnson (*pro hac vice*)
Heather M. Schneider (*pro hac vice*)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
(212) 728-8000


*Attorneys for Defendant/Counterclaimant Pfizer Inc.*

s/ William P. Deni, Jr.
William P. Deni, Jr.
J. Brugh Lower
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
wdeni@gibbonslaw.com
jlower@gibbonslaw.com

OF COUNSEL:

Bruce M. Wexler (*pro hac vice*)
Eric W. Dittmann
Isaac S. Ashkenazi
**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
(212) 318-6000

Simon F. Kung (*pro hac vice*)
**PAUL HASTINGS LLP**
1117 California Avenue
Palo Alto, California 94304
(650) 320-1800

*Attorneys for Defendant/Counterclaimant BioNTech SE*