# Exhibit A

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# Form 10-K

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Fiscal Year Ended December 31, 2024

or

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Transition Period from         to

Commission File Number: 001-34949

## Arbutus Biopharma Corporation

(Exact Name of Registrant as Specified in Its Charter)

| | |
|---|---|
| **British Columbia, Canada** | **98-0597776** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

701 Veterans Circle
Warminster
PA
18974
(Address of Principal Executive Offices)

267-469-0914

(Registrant's Telephone Number, Including Area Code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol(s) | Name of Each Exchange on Which Registered |
|---|---|---|
| Common shares, without par value | ABUS | The Nasdaq Stock Market LLC |

Securities registered pursuant to Section 12(g) of the Act: None.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | Accelerated filer | Non-accelerated filer | Smaller reporting company | Emerging growth company |
|---|---|---|---|---|
| ☐ | ☐ | ☒ | ☒ | ☐ |

*Alnylam Pharmaceuticals, Inc. (Alnylam) and Acuitas Therapeutics, Inc. (Acuitas)*

We have two royalty entitlements to Alnylam's global net sales of ONPATTRO.

In 2012, we entered into a license agreement with Alnylam that entitles Alnylam to develop and commercialize products with our LNP delivery technology. Alnylam's ONPATTRO, which represents the first approved application of our LNP technology, was approved by the FDA and the European Medicines Agency (EMA) during the third quarter of 2018 and was launched by Alnylam immediately upon approval in the United States. Under the terms of this license agreement, we are entitled to tiered royalty payments on global net sales of ONPATTRO ranging from 1.00% - 2.33% after offsets, with the highest tier applicable to annual net sales above $500 million. This royalty interest was sold to the Ontario Municipal Employees Retirement System (OMERS), effective as of January 1, 2019, for $20 million in gross proceeds before advisory fees. OMERS will retain this entitlement until it has received $30 million in royalties, at which point 100% of this royalty entitlement on future global net sales of ONPATTRO will revert to us. OMERS has assumed the risk of collecting up to $30 million of future royalty payments from Alnylam and we are not obligated to reimburse OMERS if they fail to collect any such future royalties. If this royalty entitlement reverts to us, it has the potential to provide an active royalty stream or to be otherwise monetized again in full or in part. From the inception of the royalty sale through December 31, 2024, an aggregate of $25.0 million of royalties have been collected by OMERS.

We also have rights to a second royalty interest ranging from 0.75% to 1.125% on global net sales of ONPATTRO, with 0.75% applying to sales greater than $500 million, originating from a settlement agreement and subsequent license agreement with Acuitas. This royalty entitlement from Acuitas has been retained by us and was not part of the royalty entitlement sale to OMERS.

*Genevant Sciences, Ltd.*

In April 2018, we entered into an agreement with Roivant Sciences Ltd. (Roivant), our largest shareholder, to launch Genevant, a company focused on nucleic acid- and gene editing-based therapeutics enabled by our LNP and ligand conjugate delivery technologies. We licensed rights to our LNP and ligand conjugate delivery platforms to Genevant outside of HBV, except to the extent certain rights had already been licensed to other third parties (the Genevant License). We retained all rights to our LNP and conjugate delivery platforms for HBV.

Under the Genevant License, as amended, if a third-party sublicensee of intellectual property licensed by Genevant from us commercializes a sublicensed product, we become entitled to receive a specified percentage of certain revenue that may be received by Genevant for such sublicense, including royalties, commercial milestones and other sales-related revenue, or, if less, tiered low single-digit royalties on net sales of the sublicensed product. The specified percentage is 20% in the case of a mere sublicense (i.e., naked sublicense) by Genevant without additional contribution and 14% in the case of a bona fide collaboration with Genevant.

Additionally, if Genevant receives proceeds from an action for infringement by any third parties of our intellectual property licensed to Genevant, we would be entitled to receive, after deduction of litigation costs, 20% of the proceeds received by Genevant or, if less, tiered low single-digit royalties on net sales of the infringing product (inclusive of the proceeds from litigation or settlement, which would be treated as net sales).

In July 2020, Roivant recapitalized Genevant through an equity investment and conversion of previously issued convertible debt securities held by Roivant. We participated in the recapitalization of Genevant with an equity investment of $2.5 million. In connection with the recapitalization, the three parties entered into an Amended and Restated Shareholders Agreement that provides Roivant with substantial control of Genevant. We have a non-voting observer seat on Genevant's Board of Directors.

As of December 31, 2024, we owned approximately 16% of the common equity of Genevant and the carrying value of our investment in Genevant was zero. Our entitlement to receive future royalties or sublicense revenue from Genevant was not impacted by the recapitalization.

annual basis. Pursuant to applicable law, knowing provision of false information in connection with a Non FAMP filing can subject a manufacturer to significant penalties for each item of false information. The FSS contract also contains extensive disclosure and certification requirements. If we overcharge the government in connection with the FSS contract or Tricare Retail Pharmacy Rebate Program, whether due to a misstated FCP or otherwise, we will be required to refund the difference to the government. Failure to make necessary disclosures and/or to identify contract overcharges can result in allegations against us under the False Claims Act and other laws and regulations. Unexpected refunds to the government, and any response to government investigation or enforcement action, would be expensive and time-consuming, and could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

Under Section 703 of the National Defense Authorization Act for FY 2008, the manufacturer is required to pay quarterly rebates to DoD on utilization of its innovator products that are dispensed through DoD's Tricare network pharmacies to Tricare beneficiaries. The rebates are calculated as the difference between the annual Non FAMP and FCP for the calendar year that the product was dispensed. A manufacturer that overcharges the government in connection with the FSS contract or Tricare Retail Pharmacy Rebate Program, whether due to a misstated FCP or otherwise, is required to refund the difference to the government. Failure to make necessary disclosures and/or to identify contract overcharges can result in allegations against us under the False Claims Act and other laws and regulations.

***Failure to comply with the United States Foreign Corrupt Practices Act (FCPA), and potentially other global anti-corruption and anti-bribery laws such as the Canadian Corruption of Foreign Public Officials Act, could subject us to penalties and other adverse consequences.***

We are subject to the FCPA, and potentially other applicable domestic or foreign anti-corruption or anti-bribery laws, which generally prohibit companies from engaging in bribery or other prohibited payments to foreign officials for the purpose of obtaining or retaining business and requires companies to maintain accurate books and records and internal controls, including at foreign-controlled subsidiaries.

Compliance with these anti-corruption laws and anti-bribery laws may be expensive and difficult, particularly in countries in which corruption is a recognized problem. In addition, these laws present particular challenges in the pharmaceutical industry, because, in many countries, hospitals are operated by the government, and physicians and other hospital employees are considered to be foreign officials. Certain payments to hospitals in connection with clinical trials and other work have been deemed to be improper payments to governmental officials and have led to FCPA enforcement actions.

We can make no assurance that our employees or other agents will not engage in prohibited conduct under our policies and procedures and anti-corruption laws and anti-bribery laws such as FCPA for which we might be held responsible. If our employees or other agents are found to have engaged in such practices, we could suffer severe penalties and other consequences that may have a material adverse effect on our business, financial condition and results of operations.

### Risks Related to Our Dependence on Third Parties

***We depend on our license agreement with Alnylam for the commercialization of ONPATTRO™ (Patisiran).***

In 2012, we entered into a license agreement with Alnylam that entitles Alnylam to develop and commercialize products with our LNP technology. Alnylam received FDA approval in August 2018 and launched ONPATTRO immediately upon approval. We are entitled to low to mid-single-digit royalty payments escalating based on sales performance and received our first royalty payment in the fourth quarter of 2018. In July 2019, we sold this royalty entitlement to OMERS, the defined benefit pension plan for municipal employees based in the Province of Ontario, Canada, effective as of January 1, 2019, for $20 million in gross proceeds before advisory fees. OMERS will retain this royalty entitlement until it has received $30 million in royalties, at which point 100% of this royalty entitlement on future global net sales of ONPATTRO will revert to us. From the inception of the royalty sale through December 31, 2024, an aggregate of $25.0 million of royalties have been collected by OMERS. The possibility and timing of any possible reversion of the royalty entitlement is affected by many factors including:

- Alnylam's and its distributors' and sublicensees' ability and actions to effectively market and sell ONPATTRO in each country where sold;
- the manner of sale, whether directly by Alnylam or by sublicensees or distributors, and the terms of sublicensing and distribution agreements;

- the amount and timing of sales of Alnylam in each country;
- regulatory approvals, appropriate labeling, and desirable pricing, insurance coverage and reimbursement;
- competition, including from Alnylam's next generation RNAi product AMVUTTRA® (vutrisiran); and
- commencement of marketing in additional countries.

ONPATTRO sales have declined each of the last two years due primarily to sales from Alnylam's next generation RNAi product AMVUTTRA cannibalizing sales of ONPATTRO. If Alnylam's sales of ONPATTRO continue to decline, the royalty entitlement may never revert back to us.

***We expect to depend in part on our licensing agreements for a significant portion of our revenues for the foreseeable future and to develop, conduct clinical trials with, obtain regulatory approvals for, and manufacture, market and sell some of our product candidates. If these licensing agreements are unsuccessful, or anticipated milestone or royalty payments are not received, our business could be materially adversely affected.***

We expect that we will depend in part on our licensing agreements with Alnylam and Qilu to provide revenue to partially fund our operations, especially in the near term. Furthermore, our strategy is to enter into various additional arrangements with corporate and academic collaborators, licensors, licensees and others for the development, clinical testing, manufacturing, marketing and commercialization of our product candidates or other products based upon our technology. We may be unable to continue to establish such licensing agreements, and any licensing agreements we do establish may be unsuccessful, or we may not receive milestone payments or royalties as anticipated.

Should any licensing partner fail to develop or ultimately successfully commercialize any of the product candidates or technology to which it has obtained rights, our business may be adversely affected. In addition, once initiated, there can be no assurance that any of these licensing agreements will be continued or result in successfully commercialized products. Failure of a licensing partner to continue funding any particular program could delay or halt the development or commercialization of any products arising out of such program. In addition, there can be no assurance that the licensing partners will not pursue alternative technologies or develop alternative products either on their own or in collaboration with others, including our competitors.

***We depend on Qilu for the development and commercialization of imdusiran in China, Hong Kong, Macau and Taiwan.***

In December 2021, we entered into the License Agreement with Qilu, pursuant to which we granted Qilu an exclusive (except as to certain retained rights), sublicensable, royalty-bearing license, under certain intellectual property owned by us, to develop, manufacture and commercialize imdusiran in Greater China and Taiwan. The timing and amount of any milestone and royalty payments we may receive under the License Agreement will depend, in part, on the efforts of Qilu. We depend on Qilu to comply with all applicable laws relative to the development and commercialization of imdusiran in Greater China and Taiwan. Under the License Agreement, Qilu is required to use commercially reasonable efforts to develop, seek regulatory approval for, and commercialize at least one imdusiran product candidate in Greater China and Taiwan. Any failure by Qilu to use such commercially reasonable efforts could have a material adverse impact on financial results and operations. Additionally, if Qilu were to violate, or was alleged to have violated, any laws or regulations during the performance of its obligations to us, we could suffer financial and reputational harm or other negative outcomes. Any termination, breach or expiration of the License Agreement could also have a material adverse impact on our business by reducing or eliminating the potential for us to receive milestone and royalty payments. If that were to occur, we may be required to devote additional time, costs and attention to pursue the manufacture, development and commercialization of imdusiran in Greater China and Taiwan. In certain situations, Qilu has the ability to terminate the License Agreement and retain all rights to manufacture, develop and commercialize imdusiran in Greater China and Taiwan with no obligation to make any additional milestone or royalty payments to us.

***If conflicts arise between our collaboration or licensing partners and us, our collaboration or licensing partners may act in their best interest and not in our best interest, which could adversely affect our business.***

Conflicts may arise with our collaboration or licensing partners, including Alnylam and Qilu, if they pursue alternative therapies for the diseases that we have targeted or develop or prioritize alternative products either on their own or in collaboration with others. Competing products, either developed by our present collaboration or licensing partners or any future

partners or to which our present partners or any future partners have rights, may result in development delays or the withdrawal of their support for one or more of our product candidates.

Additionally, conflicts may arise if there is a dispute about the progress of, or other activities related to, the clinical development of a product candidate, the achievement and payment of a milestone amount, the payment of royalties or the ownership of intellectual property that is developed during the course of the collaborative arrangement. Similarly, the parties to a licensing agreement may disagree as to which party owns newly developed products. If an agreement is terminated as a result of a dispute and before we have realized the benefits of the collaboration or licensing arrangement, our reputation could be harmed, and we might not obtain revenues that we anticipated receiving.

***We rely on third parties to conduct our clinical trials, and if they fail to fulfill their obligations, perform services in a satisfactory manner, and/or comply with applicable legal or regulatory requirements, our development plans may be adversely affected.***

We rely on independent clinical investigators, CROs and other third-party service providers to assist us in managing, monitoring and otherwise carrying out our clinical trials. We have contracted with, and we plan to continue to contract with, certain third parties to provide certain services, including site selection, enrollment, monitoring and data management. Although we depend heavily on these parties and have contractual agreements governing their activities, we do not control them and therefore, we cannot be assured that these third parties will adequately perform all of their contractual obligations to us. If our third-party service providers cannot adequately fulfill their obligations to us on a timely and satisfactory basis or if the quality or accuracy of our clinical trial data is compromised due to failure to adhere to our protocols or regulatory requirements or otherwise, or if such third parties otherwise fail to meet deadlines or follow legal or regulatory requirements, our development plans may be delayed or terminated.

If any of our relationships with these third parties terminate, we may not be able to enter into arrangements with alternative third parties on commercially reasonable terms or at all. Switching or adding additional third-party service providers involves additional cost and requires management time and focus. In addition, there is a natural transition period when a new third-party service provider begins work. As a result, delays may occur, which can materially impact our ability to meet our desired development timelines.

***We rely exclusively on third parties to formulate and manufacture our product candidates, which exposes us to a number of risks that may delay development, regulatory approval and commercialization of our products or result in higher product costs.***

We have limited experience in drug formulation or manufacturing, and we lack the resources and expertise to formulate or manufacture our own product candidates internally. Therefore, we rely on, and expect to continue to rely on, third-party expertise to support us in this area. We have entered into contracts with third-party manufacturers to manufacture, supply, store and distribute supplies of our product candidates for our clinical trials. If any of our product candidates receive approval, we expect to rely on third-party contractors to manufacture our products. We have no current plans to build internal manufacturing capacity for any product candidate, and we have no long-term supply arrangements.

Our reliance on third-party manufacturers exposes us to potential risks, such as the following:

- we may be unable to contract with third-party manufacturers on acceptable terms, or at all, because the number of potential manufacturers is limited. Potential manufacturers of any product candidate that is approved will be subject to regulatory compliance inspections and any new manufacturer would have to be qualified to produce our products;
- our third-party manufacturers might be unable to formulate and manufacture our product candidates and products in the volume and of the quality required to meet our clinical and commercial needs, if any;
- our third-party manufacturers may not perform as agreed or may not remain in the contract manufacturing business for the time required to supply our clinical trials through completion or to successfully produce, store and distribute our commercial products, if approved;
- drug manufacturers are subject to ongoing periodic unannounced inspection by the FDA and other government agencies to ensure compliance with cGMP and other government regulations and corresponding foreign standards. We

Exhibit 32.1

CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,

AS ADOPTED PURSUANT TO SECTION 906

OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of Arbutus Biopharma Corporation (the "Company") on Form 10-K for the year ended December 31, 2024, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I Lindsay Androski, Chief Executive Officer of the Company, certify that to the best of my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of the operations of the Company.

Date: March 27, 2025

|  | /s/ Lindsay Androski |
|---|---|
| Name: | Lindsay Androski |
| Title: | Chief Executive Officer |
|  | *(Principal Executive Officer)* |