1                      UNITED STATES DISTRICT COURT
                          DISTRICT OF NEW JERSEY
2                            TRENTON DIVISION

3

ARBUTUS PHARMA CORP.,          ) Case No. 3:23-cv-01876-ZNQ-TJB
4    et al.,                    )
                               )
5                 Plaintiffs,   ) Courtroom No. 6E
                               ) Clarkson S. Fisher Building
6    versus                     ) & U.S. Courthouse
                               ) 402 East State Street
7    PFIZER INC., et al.,       ) Trenton, New Jersey 08608
                               )
                               ) August 6, 2025
8                 Defendants.   ) 10:05 a.m.

9

10          TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
             BEFORE HONORABLE TONIANNE J. BONGIOVANNI
11                 UNITED STATES MAGISTRATE JUDGE

12   TELEPHONIC APPEARANCES:

13   For the Plaintiffs,      Midlige Richter LLC
     Arbutus Pharma Corp.     By:  JAMES S. RICHTER, ESQ.
14   and Genevant Sciences    645 Martinsville Road
     GmbH:                    Basking Ridge, NJ 07920
15
     For the Plaintiff,       Morrison & Foerster LLP
16   Arbutus Pharma Corp:     By:  ADAM R. BRAUSA, ESQ.
                              425 Market Street
17                            San Francisco, CA 94105-2482

18

     ESR/Courtroom Deputy:    John Moller
19
     Transcription Service:   Transcripts Plus, Inc.
20                            435 Riverview Circle
                              New Hope, Pennsylvania 18938
21                            Telephone:  215-862-1115
                              E-mail: CourtTranscripts@aol.com
22

     PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING. TRANSCRIPT
23              PRODUCED BY TRANSCRIPTION SERVICE.

24

25

```
 1
      TELEPHONIC APPEARANCES:
 2    (Continued)

 3    For the Plaintiff,        Quinn Emanuel Urquhart & Sullivan LLP
      Genevant Sciences GmbH:   By:  F. DOMINIC CERRITO, ESQ.
 4                                   FRANK C. CALVOSA, ESQ.
                                     ERIC STOPS, ESQ.
 5                              295 5th Avenue, 9th Floor
                                New York, New York 10016
 6
      For the Defendant,        Walsh Pizzi O'Reilly Falanga LLP
 7    Pfizer:                   By:  LIZA WALSH, ESQ.
                                     LAUREN RUTH MALAKOFF, ESQ.
 8                              3 Gateway Center
                                100 Mulberry Street
 9                              15th floor
                                Newark, NJ 07102
10
                                Willkie Farr & Gallagher LLP
11                              By:  AMANDA MAXFIELD, ESQ.
                                     REN-HOW HARN, ESQ.
12                                   SARA T. HORTON, ESQ.
                                300 North LaSalle Drive
13                              Chicago, IL 60654-3406

14    For Defendant,            Gibbons PC
      BioNTech SE:              By:  WILLIAM DENI, ESQ.
15                              One Gateway Center
                                Newark, NJ 07102
16
                                Winston & Strawn, LLP
17                              By:  IVAN POULLAOS, ESQ.
                                35 W. Wacker Drive
18                              Chicago, IL 60601-9703

19                              Winston & Strawn, LLP
                                By:  SHARON LIN McINTOSH, ESQ.
20                              1901 L Street NW
                                Washington, DC 20036
21

22                                      ***

23

24

25
```

1          THE COURT:  This is Tonianne Bongiovanni in the

2    Arbutus Pharma versus Pfizer matter, 23-1876.

3          On behalf of Plaintiff, who's on the line, and

4    perhaps you chime in in alphabetical order so you're not --

5    I'm laughing because I understand there are a number of beeps,

6    so I have no idea how many people are on.

7          MR. RICHTER:  Good afternoon, Your Honor.  This is

8    James Richter from Midlige Richter on behalf of the

9    Plaintiffs.  And with me on the line today are my co-counsel

10   from Quinn Emanuel, who will introduce themselves.

11         THE COURT:  Okay.

12         MR. CERRITO:  Good morning, Your Honor.  I'm going

13   to introduce myself second.  So first will be Frank Calvosa,

14   my name, Nick Cerrito, and Eric Stops from Quinn Emanuel on

15   behalf of Plaintiff.

16         THE COURT:  Okay.

17         MR. RICHTER:  And then -- and --

18         THE COURT:  And then on behalf of Defendant?  Oh,

19   I'm sorry.

20         MR. RICHTER:  Actually, Your Honor, that -- that's

21   okay.  I apologize.

22         Also on the line is my co-counsel from Morrison &

23   Foerster for the Plaintiff, Arbutus, and that is Adam

24   Brausa.

25         THE COURT:  Okay.

```
 1              MR. RICHTER:  And that is it for the Plaintiffs, I
 2    believe.
 3              THE COURT:  Thanks.
 4              And for the Defendant?
 5              MR. DENI:  Your Honor, I think we'll start BioNTech.
 6              MS. MALAKOFF:  Good morning, Your Honor --
 7              MR. DENI:  This is Bill Deni from Gibbons -- I'm
 8    sorry, we're starting with BioNTech.  And then we've got
 9    Winston & Strawn counsel on.
10              THE COURT:  Okay.
11              MS. MALAKOFF:  Good morning, Your Honor.
12              MR. POULLAOS:  Good morning, Your Honor.  This is
13    Ivan --
14              MS. MALAKOFF:  This is --
15              THE COURT:  Oops.
16              MR. POULLAOS:  Oh, sorry; I was going to say from
17    Winston & Strawn --
18              MS. MALAKOFF:  Sorry; I keep doing that.
19              MR. POULLAOS:  It's Ivan Poullaos and Sharon
20    McIntosh.
21              THE COURT:  Anyone else?
22              MS. MALAKOFF:  Good morning, Your Honor.
23              MALE SPEAKER:  Good morning, Your Honor.
24              MS. MALAKOFF:  This is Lauren Malakoff -- oh, I am
25    so sorry.
```

```
 1              THE COURT:  That's okay.  I hear Ms. Malakoff,

 2         MS. MALAKOFF:  I will stop talking until you call

 3    Defendant Pfizer.

 4              THE COURT:  Okay.  And?

 5         MS. MALAKOFF:  Did I cut off someone from BioNTech?

 6    Okay, this is Lauren Malakoff and --

 7         MR. POULLAOS:  No one else is --

 8         MS. MALAKOFF:  -- and Liza Walsh from Walsh Pizzi

 9    O'Reilly Falanga.  And with us on the line from Willkie Farr &

10    Gallagher, we have Sara Horton, Ren-How Harn, and Amanda

11    Maxfield.

12              THE COURT:  Super.  When we go through the

13    discussions, if you could just identify yourself.  And if

14    you're the main person speaking, then you don't every time you

15    have to -- every time you chime in.  So, just so it's clear,

16    obviously, on the record who is speaking.

17              And before I get into business, Mr. Richter, I am

18    extremely insulted that you are leaving me at 10:30 for Judge

19    Waldor, who is retiring at the end of the month.  And you

20    should have no reason to prioritize her call over mine.  So,

21    you tell her that I was offended, and that she and I can, you

22    know, arm wrestle later on.

23                        (Laughter)

24              THE COURT:  Anyway, but no worries.

25         MR. RICHTER:  Your Honor; thank you.  And I will
```

1    certainly tell her that.  And I'll tell her that you said some

2    worse things, as well.

3              THE COURT:  Yeah, she'll just be used to that.

4                        (Laughter)

5              MR. RICHTER:  Right, exactly; thank you.

6              THE COURT:  And I don't know precisely who called,

7    but just to let you know that someone called this morning, I

8    think they identified themselves as an investor.  That was

9    the extent of what I heard.  But my law clerk indicated that

10   this was a discovery issue, not for the public to participate

11   in.

12             So, again, we didn't get any -- I didn't get any

13   more detail.  And if you care — and I don't mean that

14   flippantly — when we're done, I can check with Peter, who took

15   the call.  I just wasn't able to pay much attention to it

16   because I've been rocking and rolling on other calls, but

17   other than to say no.

18             Okay.  So, before we get into the substance of the

19   issues, I just want to make sure that I know what's left on

20   your plate.  I have the letters from June 6th, 20th, 27th,

21   they're all filed on the docket, and a significant number of

22   exhibits.

23             So, let me hear from Plaintiff first to identify

24   what issue or issues we're dealing with today.

25             And by the way, I appreciate that since our last

1    conference, you have resolved a number of issues, which I

2    sincerely appreciate.

3              So, Plaintiffs' side, who wants to start?

4              MR. CERRITO:  Good morning, Your Honor.  Nick

5    Cerrito again from Quinn Emanuel on behalf of Plaintiff.

6              What we understood this conference to be this

7    morning was concerning our -- Plaintiffs' motion to compel the

8    Government negotiation documents.

9              THE COURT:  Super.

10             MR. CERRITO:  That's what we understood.

11             THE COURT:  Okay.  And, Mr. Cerrito, are there any

12   other -- since I have you.  Are there any other issues that

13   are percolating or does this seem to be the last for now?

14             MR. CERRITO:  Well, "last" is a relative term, Your

15   Honor.

16             THE COURT:  Yeah.

17             MR. CERRITO:  Nothing --

18             THE COURT:  And let me phrase it this way.  Nothing

19   else is ripe for me.

20             MR. CERRITO:  From Plaintiffs' side, that is

21   correct.

22             THE COURT:  Okay.  And on the Defendants' side,

23   just, again, that simple question, is that your understanding

24   of what we're dealing with today?  But equally as important,

25   so I can get a better perspective, are there any other issues

1    that you believe are ripe?

2           MS.   HORTON:   Good morning, Your Honor.   Sara Horton

3    from Willkie Farr for Pfizer.   I'm going to be speaking

4    largely for Defendants today.

5           We generally agree with what Mr. Cerrito noted, that

6    today up for discussion is Plaintiffs' motion to compel on the

7    letter briefing that Your Honor recited a moment ago.

8           Nothing else ripe for Your Honor on the discovery

9    front, we would agree with that.

10          I will just note that there is a pending motion to

11   amend invalidity contentions that is fully briefed.   However,

12   I don't believe that's up for today.   However, if Your Honor

13   would like to hear about that in a different oral argument

14   setting, we'd be happy to do so.

15          THE COURT:   Super.   Thank you.

16          So, let me turn to Mr. Cerrito.   And, of course,

17   anything that you want to emphasize as we're moving along,

18   feel free to do so.   I know you'll answer any questions that I

19   have, of course.   But anything else that you want to, again,

20   emphasize, or highlight, or add to the arguments that you've

21   submitted in your papers.

22          But let's start with the notion that this was -- is

23   moot.   This issue is moot because of the negotiations that you

24   folks had years -- in the last couple of years, so -- and then

25   we'll turn to the Georgia-Pacific factors.

1          MR. CERRITO:  Thank you, Your Honor.  Nick Cerrito

2   again from Quinn Emanuel on behalf of Plaintiffs.

3          I think what -- the issue was squarely presented in

4   our reply brief.  First, Plaintiffs made no such agreement.

5   We had offered to make an agreement with Defendant, and

6   Defendant — I'll give them all the benefit of the doubt —

7   believed such an agreement was entered.

8          But as we pointed out in the reply brief, that

9   agreement was squarely rejected.  It was rejected, not by us,

10  but by Defendant.  And I would give you a point -- Your Honor

11  a point cite on the submissions; as you said, there were quite

12  a few exhibits.  If you -- if you turn to Exhibit N, and I'm

13  going to cite specifically Page 14 and, again, Page 18.

14  Fourteen is the response that they say they're responding to

15  our offer in that -- on that page.  And that offer came from

16  the February 19th and February 28th communication.

17         But if you go to the February 18th, and the -- you

18  can see on that page, March -- the March 1, 2024, they

19  responded to both those emails, and they said, and I quote,

20  that, "They maintain that agreements and communications are

21  relevant to this litigation and must be produced."  And so,

22  with that, there was no agreement.  And with that, Plaintiffs

23  produced such documents.

24         This, at a minimum -- if we never talk about another

25  thing here, at a minimum should be reciprocal.

 1              THE COURT:  Okay.  Ms. Horton?

 2              MS. HORTON:  Yes, Your Honor.  I think a little bit

 3    of the confusion here comes from the fact that in our

 4    opposition, we pointed out that there was actually an

 5    agreement, and that we accepted it.  I don't have the actual

 6    exhibit to cite to you because we understood, per Local Rule,

 7    that Your Honor would rather not have us submit voluminous

 8    discovery correspondence, of which there is a lot, attached to

 9    our briefing.

10              We did make an offer in one of our footnotes, I

11    think, to submit things under -- for Your Honor's review, if

12    you would like.

13              But let me just -- you know, Mr. Cerrito discussed

14    and pointed out in a May 1st email what he says is a rejection

15    of that offer.

16              However, what's not before Your Honor, and what is

17    quoted and discussed in our opposition brief comes from a

18    March 28th, 2024 letter from Defendant.  And I will read this

19    to you, quote -- and I'll give you, for opposing counsel's

20    benefit, exactly where I'm reading from in that letter.  It's

21    from Paul Hastings at Pages 8 and 9.  There is a bolded

22    section, which says, quote, "Question 5.  Whether Defendants

23    would agree to limit both sides' productions to agreements

24    or licenses that are final and executed."  Citing numerous

25    RFPs.

1          And then the response directly thereunder is, quote,

2     "For RFPs," listing numbers, "subject to Defendants'

3     objections, Defendants intend to produce executed agreements

4     relating to the development of the lipid nanoparticle

5     components of the accused product and manufacture, sale, and

6     distribution of the accused product, to the extent they can

7     to" -- I'm sorry -- "to the extent they exist and can be

8     located after a reasonable search.  Some such agreements may

9     be subject to obtaining permissions of third parties, such as

10    purchase agreements between Pfizer and the U.S. government."

11    End quote.

12         That's what we said on March 28th, 2024 in response

13    to their question about limiting agreements and licenses to

14    final and executed.

15         We even indicated that, for example, that would

16    relate to U.S. government contracts.  We talked about how we

17    would need permission from third parties, like the Government,

18    in order to produce these documents.

19         We reconfirmed that we would be producing executed

20    agreements a month later on April 30th.  Again, this is not in

21    your -- there is no exhibit cite here because, Your Honor, we

22    did not attach it.  But I will read it, quote, and -- so that

23    opposing counsel can read along with me.  But this is a April

24    30th, 2024 letter from Paul Hastings, again for Defendants, at

25    Pages 4 and 5.  We say, quote, "Plaintiffs are, on the one

1    hand, asking Defendants," us, "to produce documents and

2    communication related to negotiations while, on the other

3    hand, refusing to produce such documents that are in

4    Plaintiffs' possession."

5            And it goes on to say, quote, "Accordingly,

6    Defendants maintain that our response to RFPs," and then lists

7    them, it says, "i.e., we intend to produce executed agreements

8    relating to the development of the lipid nanoparticle

9    components," etc., etc.

10           So we said we were going to produce executed

11   agreements.  They posed the question.  We responded that we

12   would produce executed agreements.

13           Thereafter, the parties continued to negotiate ESI

14   protocols, search terms, custodians, all kinds of other

15   things, leading up to a substantial completion of document

16   discovery in October of 2021.

17           We produced the executed contracts with the

18   Government on October 11th, 2020 -- or sorry, 2024.  2024

19   should have been the year on both of those dates.  Plaintiffs,

20   too, produced executed agreements.  And as recently as April

21   4th, 2025 noted that both sides have produced executed license

22   agreements, and not drafts, because it's unduly burdensome and

23   not proportional.

24           So I think the course of conduct, and what everyone

25   has been saying in this case, has been that we are producing

1   executed agreements.  Yes, there were negotiations on it,

2   going both ways, Your Honor.  But Plaintiffs and defendants

3   have produced dozens of executed agreements.

4           And the case law --

5           MR. CERRITO:  Your Honor --

6           MS. HORTON:  -- that both cite in their briefing

7   does not indicate that negotiations and drafts are relevant,

8   proportional, and not burdensome.

9           In fact, not one of the cases that Plaintiffs cites

10  actually ordered production of internal communications,

11  negotiations, or a draft regarding negotiations of agreements

12  for damages purposes or otherwise.

13          THE COURT:  Okay.

14          MR. CERRITO:  May I respond, Your Honor?

15          THE COURT:  Mr. Cerrito?  Yes, of course.  Of

16  course.

17          MR. CERRITO:  Yeah, obviously I feel ambushed.  Not

18  only were the documents not attached, these arguments were not

19  made in their brief.  So this is all new.  I've had no chance

20  to address any of this material, which I think is, you know,

21  obviously unfair.

22          But regardless, I'll read -- I'll reread the quote

23  from Defendant, also from Paul Hastings' letter.  "They

24  maintain that agreements and communications are relevant to

25  this litigation and must be produced."  End quote.

1          We produced those documents.  We produced the

2    communications.  They chose not to.

3          While counsel repeatedly said they produced executed

4    agreements.  Nobody is disputing that.  That's not what we're

5    talking about here.

6          And while the case law that they say doesn't

7    support our position, they -- there's not a single case

8    that they cited that supports theirs, certainly not one that

9    even talk about the situation that we're in here.  These are

10   very unique.  This is a unique situation where we're talking

11   about non-monetary gain here from the from the Pfizer

12   standpoint.

13         So none of those cases address -- they -- I'll just

14   point out one that they address, which is Jazz versus Amneal.

15   A case before Judge Salas, I know it well because I'm counsel

16   of record.  It had absolutely nothing to do with reasonable

17   royalties.

18         It was an ANDA case.  It had to do with whether or

19   not the information was relevant to validity, and the court

20   denied it.

21         They also talked about a due diligence schedule

22   case, that's the M&ECA case.

23         So none of those addressed the situation we're

24   talking about here.

25         THE COURT:  Okay.

1              MS. WALSH:  Your Honor, this is Liza Walsh --

2              MR. CERRITO:  Also --

3              THE COURT:  So --

4              MR. CERRITO:  May I finish, Your Honor?

5              MS. WALSH:  My apologies.

6              MR. CERRITO:  So, again, not having the ability to

7    even address these issues, because it wasn't raised in their

8    brief, and certainly it wasn't attached.  If there was a

9    stipulation, if it was as clear as they suggest, you would

10   think they'd show us the document where that exists.  It

11   doesn't.  I have -- we have submitted the document that shows

12   it doesn't exist.

13             And that being said, again, the negotiations here

14   were unique.  It's talking about non-monetary gain.  And what

15   that stems from is conversations they have had from the Pfizer

16   CEO who originally valued this product at $600 a dose.

17             They then talked about a hundred and fifty to $200 a

18   dose, because they didn't want to be perceived as taking

19   advantage of the pandemic.  That number eventually was

20   negotiated down to $19.50  So they could gain something more

21   than money, which is the goodwill of the industry, put a good

22   shine on their -- on the -- on the Pfizer name, and, we

23   believe, ultimately to sell additional products through

24   convoyed sales with other flu vaccines and things like that.

25             So these negotiations -- again, there's no case law

1   that says these negotiations are not relevant, that haven't

2   cited anything.  (Indiscernible) fact, and I'm happy to do so.

3   It's clearly relevant under the Georgia-Pacific factors; we

4   identified five of them.  We get critiqued in the brief as

5   saying, well, you know, this is just one.  I'm not sure how

6   many factors you need.  We certainly cited a case where one is

7   enough.

8        That being said, it's proportional to the value of

9   this case, which is obviously very large, multiple billions of

10   dollars, maybe the largest potential damages award pending

11   before any court in this country.

12        So, between the five Georgia-Pacific factors, the

13   proportionality, which, again, I can go through all of the

14   factors for Your Honor, and I don't want to stray too far from

15   the question you asked.  But each one of those factors has

16   satisfied this proportionality here.

17        And, again, there was no agreement to forego this

18   discovery.  In fact, they've specifically rejected and

19   demanded it.  Plaintiffs gave that to them.  There is no

20   burden here.  They haven't demonstrated burden, as their -- as

21   their obligation to do so.  This is normal discovery and it

22   should be produced.

23        THE COURT:  Before I hear from Defendants --

24        MS. HORTON:  Your Honor --

25        THE COURT:  -- and I appreciate that conducting

1    these conferences by phone is very difficult to know when

2    someone is taking a breath versus done with their argument.

3    So I appreciate how you folks are being respectful of one

4    another's time.

5          But before I switch to the Defendants, Mr. Cerrito,

6    the Defendants mention in their June 20th letter the notion

7    that there was a draft agreement and negotiations, and that

8    this issue was resolved a year ago.  So I'm not sure what

9    information you haven't had the opportunity to respond to.  I

10   did, of course, hear references to documents themselves, which

11   I would ask the Defendants to submit to me/us in whatever

12   format, maybe just via email for now.  And then we can always

13   upload and seal on the docket, if necessary.  But we can talk

14   about that.

15         So what -- and I don't mean this in a disparaging

16   condescending way, but what's your gripe with what you just

17   heard that was new?

18         MR. CERRITO:  Well, the two documents that counsel

19   mentioned were not in the brief, were not discussed in the

20   brief.

21         THE COURT:  Got it.

22         MR. CERRITO:  They talk about an agreement; I showed

23   Your Honor why that isn't true.

24         THE COURT:  Yes.

25         MR. CERRITO:  And as we're sitting here, we were

1    able to pull up that April agreement -- April letter.  It

2    doesn't memorialize an agreement.  It's Defendants saying they

3    are producing only the executed agreements.  That is not an

4    informalization [sic] of an agreement.  If there was a

5    stipulation, if there was an agreement of parties, they would

6    have put that front and center to Your Honor.  It doesn't

7    exist because it never happened.

8             THE COURT:  Okay.

9             Defendants, I think I heard both Ms. Horton and

10   maybe Ms. Walsh.  So who wants to -- maybe I was wrong.  Who

11   wants to respond?

12            MS. WALSH:  Your Honor, this is Liza Walsh.  I just

13   wanted to address the procedural issue first.

14            You know, we honored, and we always aim to honor the

15   Local Rules and the burdens that are placed on this Court.

16   And it was my view that we should not bombard Your Honor with

17   all of the exhibits because that's what the Local Rules

18   provide.

19            Plaintiff did not seek permission to submit all of

20   those exhibits.  We made it clear in the footnotes in the

21   subsequent letter asking for oral argument, that we are

22   relying on exhibits, but were not going to be presumptuous to

23   submit them to Your Honor and bombard you with those exhibits

24   without the Court's permission.

25            So to the extent that Your Honor is unable to decide

1    the issue without seeing those exhibits, we will be more than

2    happy to submit them, with the Court's permission.

3              THE COURT:   Okay.   Thank you.

4              Ms. Horton, was there anything, I guess, substantive

5    that you'd like to put on the record?   I recognize that

6    Plaintiff doesn't have in their hands the documents that

7    they're referencing.   After we receive the exhibits and the

8    transcript — I don't want to beat this horse to death — but I

9    may feel, in fairness, that it's worth reconvening on this

10   issue.

11             So you can certainly preserve any response.   I will

12   give Mr. Cerrito the opportunity to either -- we'll have

13   another quick conference call, or if he wants to write

14   something, rather than us talking, perhaps I get a

15   response, although that seems more inefficient and more time-

16   consuming.

17             So I'm inclined to -- a long-winded way of saying

18   I'm inclined to have you produce -- the Defendants produce the

19   documents that you just referenced.   We can get a transcript

20   in our hands so we understand the arguments that you've

21   expanded upon, or with your references to the documents, and

22   then I can reconvene and hear from Plaintiffs.

23             Very, very long-winded intro into anything, though,

24   Ms. Horton, you'd like to highlight or state on this specific

25   issue?

1              MS. HORTON:   Your Honor, yes; thank you.

2         Look, the background section of our opposition on

3    June 20th goes through this issue.   It goes through this issue

4    and states this is not bombardment.   This is exactly what we

5    were saying in the background section where we say that in

6    response, we had agreed to produce executed agreements.

7    Plaintiffs clearly knew that because in their reply, they took

8    issue with it.   So they knew what was happening there.   It's

9    not like this was -- this is -- this is correspondence in the

10   same month between the parties.

11             I would also know that Mr. Cerrito uses this March

12   1st, 2024 email as his basis for saying that there was no

13   agreement.   But that very email he cites states -- and

14   attaches to their letter briefing says that "Regarding

15   Questions 1 through 3, and 5" -- 5 is the question about an

16   executed agreement or not -- "plaintiffs will provide further

17   response."

18             So right in that same email that he attaches --

19   that they attach to their letter brief, Your Honor, it notes

20   that we are going to respond to that question separately from

21   the email on the 1st.   So this is not -- this is not unknown

22   to the Plaintiffs.

23             And I -- so we would be happy to submit anything

24   Your Honor wants, but we do think that this is ripe for

25   decision.   The parties are on good paper.

1        There was -- there -- the agreement was that parties

2    were going to produce executed agreements.  Plaintiffs want to

3    go back on that now.  This was all done in 2024.  We

4    negotiated lots of discovery things through the course of 2024

5    and the lead up to the substantial completion of document

6    production.

7        There is -- there's all kinds of other things we

8    could go into there, if Your Honor wanted to hear further

9    argument.  But one other thing that I heard Mr. Cerrito say

10   was with regard to the Georgia-Pacific factors, he noted that

11   even one factor having relevance would be enough for

12   production.  But in the very case they cite on that point,

13   which is the Positive Tech case that they cite in their brief,

14   the thing that was produced for that Georgia-Pacific factor

15   was executed agreements.  There are no cases that they cite

16   that the types of information that they want are relevant,

17   proportional to the needs of the case related to damages, or

18   not burdensome.

19             THE COURT:  Okay.  And in terms of --

20             MR. CERRITO:  May I --

21             THE COURT:  While you have the floor, and then I'll

22   turn back to Mr. Cerrito, not only do you challenge the

23   Georgia-Pacific factors, but you also make the argument that

24   it's not proportional to the needs of the case and the burden.

25   And those are -- and, again, this is not meant in a

1    condescending or judgmental way, but oftentimes folks invoke

2    those to requirement or prohibitions to production, but

3    without any real meat.

4         So what else would you like to say as to why?

5    You're a sizable entity; lots of resources.  So anything you

6    would like to expand upon in terms of why there would be --

7    assuming I deem that the information is relevant, why it's a

8    burden and not proportional to the needs of the case since

9    this seems to go --

10         MS. HORTON:  Sure.

11         THE COURT:  -- precisely to damages.  So --

12         MS. HORTON:  Your Honor, I guess I would --

13    certainly "slightly towards damages" might be the best way to

14    put it, actually, but that's not enough for proportionality in

15    this case.

16         In our brief, we go through the Rule 26 importance

17    to the issue, importance to discovery, and then burden.  Look,

18    this is not in a vacuum here.  The Defendants have already

19    produced more than 500,000 documents, more than 8 million

20    pages based on an ESI protocol with heavy input from

21    Plaintiffs.

22         Pfizer has not withheld otherwise responsive

23    documents as part of its ESI process on these issues.

24         And, of course, the burden depends on scope, which

25    has been a shifting target, Your Honor.  When we first heard

1    about these issues back in 2024, it was related to one price

2    change that they noted in discovery responses.  Then they

3    changed their tune and wanted information related to four

4    agreements between 2020 and 2022.  Then we seem to be now

5    wanting drafts and negotiations, and maybe now all internal

6    deliberations, whatever that means.  And then in the opening

7    letter brief, it seems to be all documents for all of those

8    things.

9         By the time we get to their reply brief, it appears

10   that now we're focused again on just the four executed

11   agreements that we've already produced in the 2022 -- sorry --

12   2020 to 2022 timeframe.

13        So, the burden here, Your Honor, depends a little

14   bit on the scope of the ask.  The breadth of the ask,

15   obviously, provides more of a burden.  Without waiving any

16   work product, right?  We have investigated this issue, and

17   sought to figure out if we could produce what Defendants ask -

18   - or sorry, Plaintiffs' ask based on their reply brief.  We've

19   talked to Pfizer colleagues, including people involved in

20   negotiations and legal.

21        It's not like there's a central repository where we

22   can go search for and collect the full scope of what they've

23   asked.  We've checked.  These are complicated agreements for

24   the sale, supply, manufacture, distribution of hundreds of

25   millions of doses of vaccines, combined with the unprecedented

1    nature of the global pandemic happening at that time.  We

2    know, and I don't think it's a secret to say, there were

3    different people and many different people involved in those

4    negotiations over time.

5           So depending on scope, this would require Defendants

6    to identify, collect, and review, and produce from numerous

7    sources many more custodial sources, because there is no

8    central repository for this stuff.

9           We've already -- Pfizer alone has already provided

10   ESI from 12 custodial sources.  That's the same number of

11   custodial sources, by the way, Your Honor, that both

12   Plaintiffs total have provided documents from.  And depending

13   on the scope, this undertaking could take another similar

14   number of custodians.  Adding that number of custodians for

15   additional information in this regard is burdensome,

16   especially given the lack of relevance to the case.

17          The burden would also -- this is also, I don't think

18   a surprise to anyone, the burden would also be on the review

19   itself, separate and apart from collection efforts across

20   multiple additional sources.  We know there would be

21   significant burden with regard to privilege review.

22          It's not shocking that lawyers were involved in the

23   ins and outs on these United States government contracting

24   issues, especially for contracts of this magnitude.  And so

25   there is more context about the burden, Your Honor.

```
 1              THE COURT:  Okay.  So --

 2              MS. HORTON:  Look, the other -- the other burden

 3    issue is --

 4              THE COURT:  I'm sorry.

 5              MS. HORTON:  -- that the Government, of course --

 6    I'm sorry.  I'm sorry, Your Honor, for cutting you off.

 7              THE COURT:  That's okay.

 8              MS. HORTON:  The other issue, Your Honor, is, of

 9    course, the Government would want a chance -- like we said in

10    our objections and responses to the very first RFPs on these

11    issues, and as we mentioned again in our March 28th, 2024

12    agreement, that we would produce (indiscernible) draft.

13              We need -- this would all be subject, you know, to

14    the permissions of third parties, including the U.S.

15    government.  The Government has said in its subpoena responses

16    and objections that Plaintiffs have recently given to us,

17    they've -- they've subpoenaed HHS and the Army, said that a

18    lot of this stuff would be confidential.  They don't want it

19    given to the public.  And they even say in their subpoena

20    responses that some of it could be related to national

21    security.

22              So there's a further layer of burden here than for

23    just Pfizer to go do things.

24              THE COURT:  Okay.  Mr. Cerrito, a lot of

25    information.
```

1          MR. CERRITO:  Yes, there's --

2          THE COURT:  Go ahead.

3          MR. CERRITO:  There's a lot that wasn't in their

4    papers.

5          THE COURT:  So whatever order --

6          MR. CERRITO:  Yeah, a lot that wasn't in their

7    papers, but regardless, let's go through it.  They talk about

8    the background.  And they've talked about all this agreement

9    between the parties.

10         What they didn't talk about it citations, because

11   there were none; or attachments, because there were none.  And

12   despite Ms. Walsh's conversation about putting on attachments,

13   it there was a written agreement between the parties, don't

14   you think the Court would have been served to have that

15   agreement and end this?  But there wasn't, because there

16   isn't.

17         Also noticeable is the Defendants never once take

18   issue with the quote that I have read multiple times on this

19   call.  Demanding that they both give agreements and

20   communications relevant to this litigation.  So that's

21   telling.

22         When they talk about the cases in this -- there --

23   there is one case that I think stands out among many, but

24   really stands out quite loudly, which is Aqua Shield.  If you

25   go -- I'd ask the Court to go back and look at that one.  It

1    was reversed on the exact same grounds that this discovery is

2    seeking, non-monetary relief.  The sales price.  The sales

3    profits on the infringing product.  Federal Circuit reversed

4    on this issue; Aqua Shield directly on point.

5            The proportionality issue, I am almost -- I'm

6    dumbfounded that if -- yes, there were hundreds of billions of

7    doses.  This is a huge company.  Pfizer's massive.  There are

8    also potentially billions and billions in damages here.

9    Billions.

10           So is it complicated?  Maybe.

11           Would it take a little discovery effort?  Probably.

12           Is it proportional?  Absolutely.  No question about

13   it.

14           It is clearly relevant to the Georgia-Pacific

15   factors, which we didn't hear addressed by Defendant in this

16   call.

17           It's a multi-billion dollar case.  The Defendants

18   clearly have access to this information.  As I said, they're a

19   massive law firm -- massive companies with massive law firms

20   supporting in this case, which, as I said, Georgia-Pacific

21   factors, at least five of which are relevant.

22           And, again, we think this is normal discovery

23   burden.  Not extraordinary.  Not unduly.  We heard a lot of

24   new things on this call, but none of which satisfied this

25   obligation for them to come forward and show why this is

1  unduly burdensome.  What they're talking about is normal

2  discovery.  That's what this is.

3          One wonders how much time and money Defendants have

4  bought -- spent to argue this motion, whether they could have

5  just done the searches and been done with it.  They spent, it

6  seems in my mind, far more time and money arguing about this

7  than just doing it.

8          With regard to the Government, obviously it's their

9  right to put the objection in, not Pfizer's.  Pfizer's

10 internal documents are not covered by that.  And to the extent

11 that there is issues, we have a protective order in place.

12         Because they say "national security" doesn't make it

13 so.  I don't even know how to address that, because we haven't

14 had that discussion with the Government or anybody implying

15 such.

16         So at the end of the day, I think it's pretty clear

17 there was no agreement.  This information is clearly relevant,

18 it's clearly proportional, and should be produced.  It was

19 done so by Plaintiffs, Defendants should also.

20         THE COURT:  So let me ask regarding the Georgia-

21 Pacific factors, and there are, I think, five that you

22 highlight.  I understand your argument is that the ultimate

23 agreement is -- does not end the discussion.  And, frankly,

24 I'm not quite clear on that.  I don't want to say I'm not

25 buying it, but.

1              So, I guess, why isn't the ultimate agreement just

2    enough?  You have comparisons of what else is happening in the

3    market with this product.  You know, you can make comparisons

4    without the underlying data.  So, again, I'm not sure what

5    argument could be made that the damages, I suppose, are more

6    significant.

7              So, Mr. Cerrito, let me have you respond to that

8    concern of mine.

9              MR. CERRITO:  Sure.  Let me try to get you to buy

10   it.  Again, I would ask the Court to look at Aqua Shield,

11   directly on point here.

12             I'd also say that, you know, Defendants' documents

13   have shed light on why Pfizer accepted a lower price on the

14   value they ascribed to the non-monetary benefits, right?  So

15   they talked about -- under their valuation process, it was

16   worth $600 a dose.  They took a lot less.  Why?  Because they

17   got some non-monetary value.  That's the discovery.  That's

18   the point of Aqua Shield.  That's what this discovery is

19   directed to.

20             And that ultimately plays into what a reasonable

21   royalty or what they would have agreed to a reasonable royalty

22   to be.  So that -- that is a -- the non-monetary benefit, also

23   to the extent that it's just a lower price because of

24   goodwill, it's also, as we talked about in our brief,

25   potentially convoyed sales.  Meaning they use this technology

1    for other vaccines.  And maybe the normal flu vaccine gets

2    lumped into this -- these potential goodwill and sales going

3    forward.

4           So the reason that final agreements aren't good

5    enough is because of what they did and how they went about it

6    in negotiating these agreements.  And, again, it reflects

7    directly upon what they would have agreed to pay as a

8    reasonable royalty.

9           THE COURT:  Okay.  Ms. Horton?

10          MS. HORTON:  Your Honor, I'm not entirely sure where

11   to start there, other than, you know, some of the things that

12   were just said about size and scope of our company, and cost

13   to argue this motion.  I don't think they're actually relevant

14   to this.

15          What I've said on the record is, you know, I have an

16   obligation to be truthful, and I have been.  I don't think

17   that there's any indication that I'm not being, but I want to

18   make that clear in case that was part of the implication.

19          The notion that I didn't address what Mr. Cerrito

20   says is our rejection of Plaintiffs' proposal, that we produce

21   executed agreements only, which we did not reject.

22          The notion that I didn't address it is also just not

23   true.  That was one of the first things I said in my argument

24   here this morning.  And then I quoted two places where we did

25   confirm that we were going to produce the executed agreements.

```
1    I'm sure that Plaintiffs know where those things are; I cited
2    them on the record.
3         We also mentioned that that had happened in our
4    briefs, and a lengthy background section about how we got to
5    where we are.
6         As far as Aqua Shield goes, yes, that is a Federal
7    Circuit case.  But what Aqua Shield was looking at was the
8    treatment of defendant's profits.  The district court had
9    stated that the profits earned during the period of
10   infringement as a royalty cap, and did not consider that
11   defendant could have raised prices over what it actually
12   charged for infringing sales to count fully or partially for a
13   royalty payment.  That's what the case is there.
14        In our case, no one disputes that a hypothetical
15   negotiation is forward-looking.  The issue is what the
16   Government contracts -- the issue is that the Government
17   contracts have nothing to do with a hypothetical negotiation,
18   which is, you know, what are the terms of a fair patent
19   license that the parties would have reached had the parties
20   negotiated at arm's length when infringement first began.
21        We've produced the executed agreements.  That's what
22   the parties agree in that -- in that United States government
23   negotiation agreed to.  That's what both parties ended up
24   signing on the dotted line, and that is what governed their
25   relationship.
```

1          We've also produced extensive information about

2    actual sales, about what was sold, how it was sold under those

3    agreements.

4          We've produced profit and loss statements.  We've

5    produced voluminous financial discovery.  This is not a case

6    where discussing what hypothetically might have been done in a

7    speculative world of negotiation is more relevant than what

8    was actually done.

9          The other issue I want to, you know, go through is

10   that -- well, why don't I -- why don't I stop there for now,

11   Your Honor?

12              THE COURT:  Okay.  The --

13              MR. CERRITO:  May I?

14              THE COURT:  If there was a benefit --

15              MR. CERRITO:  May I --

16              THE COURT:  -- Ms. Horton, that was part of the

17   bargain, but didn't find its way into an agreement, would that

18   be discoverable?

19              MS. HORTON:  That -- look, I -- we can talk -- I

20   think it's hard to talk about relevance without talking about

21   proportionality, right?

22              However, again, none of the Plaintiffs' cases that

23   they cite actually order production of these types of

24   documents.  I think it is telling that, look, that even one of

25   the cases that we cited in one of -- in our brief,

1  LaserDynamics, talks about that "Actual licenses to the

2  patented technology are highly probative of what constitutes a

3  reasonable royalty for those patent rights because such actual

4  licenses most clearly reflect the economic value of the

5  patented technology."

6          If we're looking to discern the economic value of

7  things, we look at what was actually agreed.  We don't look at

8  what is speculative.

9          With regard to the actual Georgia-Pacific factors

10 that Mr. Cerrito cites to, they do cite to a few.  And they

11 have one case, like he noted earlier, where relevance to one

12 Georgia-Pacific factor is enough.  But that case actually

13 comes out the same way we would say this should come out.

14 Production of executed agreement.  That's how that case came

15 out.

16         When there was a dispute about whether or not one

17 Georgia-Pacific factor was enough to show relevance or

18 discoverability, the court ordered that actual licenses be

19 produced.  Actual agreements, not the entire panoply of

20 negotiation and internal communications that it appears

21 Plaintiffs are seeking here.

22         THE COURT:  Okay.  So I'm going to give Mr. Cerrito

23 the floor and then, since you're literally and figuratively on

24 the defensive on this issue, Ms. Horton, I'll give you the

25 last say.

1          And as I mentioned, at the end of this, I'd like to

2    have you submit to us, you know, perhaps just for now, as I

3    also said, just submit to us via email the documents that you

4    reference.  And I can -- we can then obviously review them,

5    and I can consider them in this context and decide what to do,

6    if I want anything else further from you both.

7          So, Mr. Cerrito, back to you.  Whatever you'd like

8    to say to wrap up, and then I'll turn --

9          MR. CERRITO:  Yes, Your Honor.  Thank you, Your

10   Honor.

11         I would go back and, again, ask the Court to read

12   Aqua Shield.  It's pretty clear that the court rejected

13   looking at these non-monetary benefits, the actual selling

14   price of the infringing product, and it was reversed for not

15   looking at it.  That's the holding.  I ask the Court to look

16   at it.

17         The non-monetary benefits received by an infringer

18   are unquestionably relevant.  We cited cases for that, Asetek

19   Danmark versus CMI.  The parties to the hypothetical

20   negotiations may base their royalty in full or part on other

21   measures of value, including profits for non-monetary

22   benefits.

23         The non-monetary benefits, again, Pfizer said it was

24   worth $600.  They sold it for a lot less.  Why?  Because they

25   were getting non-monetary benefits.  That's why.  That's why

1    this discovery is relevant.  That's why it's important.

2              Proportionality, I'm not even going to get into

3    again.  That -- it's not a close call.

4              And I'll leave it with this.  The last word on the -

5    - on the -- they didn't address, as I pointed out before, the

6    line from March 1st, 2024 letter, and I'll read it one more

7    time for the record.  "They maintain" -- this is a quote --

8    "that the agreements and communications are relevant to this

9    litigation and must be produced."  That, they've never

10   responded to; maybe they will now.

11             Thank you, Your Honor.

12             THE COURT:  Ms. Horton?

13             MS. HORTON:  Your Honor, thank you.  Yes, the

14   response to that, as discussed earlier in that same email

15   chain, is that we would respond to Question Number 5, posed by

16   Plaintiffs, at a later time.

17             Then on 3/28/2024, there's a letter from Defendants

18   to Plaintiffs, which they did not put into the record, and

19   they did not use in their reply briefs, and they fully ignore,

20   even though we mention it in our response in opposition.  We

21   say in response to Question Number 5, which was "Whether

22   Defendants would agree to limit both sides' productions to

23   agreements or licenses that are final and executed."

24             The response is unequivocally, "Defendants intend to

25   produce executed agreements relating to the development of the

1    lipid nanoparticle components of the accused products and

2    manufacture, sale, and distribution of the accused product, to

3    the extent they exist, and can be located after a reasonable

4    search.  Some such agreements may be subject to obtaining

5    permission of third parties, such as purchase agreements

6    between Pfizer and the United States government."  That was

7    the answer to the question.  The answer to the question was

8    affirmative.

9         We then reconfirmed that several times.  The parties

10   then produced executed agreements, and executed agreements

11   only.

12        We did not hear boo on this issue then until 2025

13   when Plaintiffs changed their mind.  After all of the

14   discovery and all of the things that we had worked so hard to

15   negotiate with one another in 2024, and even early 2025, had

16   already come to pass.

17        Look, even Defendants themselves -- Plaintiffs

18   themselves have as recently as April of this year stated that

19   both sides have produced executed license agreements and not

20   draft license agreement and negotiation.

21        That's because it's unduly burdensome and not

22   proportional.  That's what they say.  That's what they say

23   about drafts and negotiations.

24        Look, Your Honor, what's good for the goose is good

25   for the gander here.  If Pfizer is required to produce the

1    broad discovery that is being sought, we're going to have to

2    go back and reconsider this.  What we say is agreement, I'm

3    hearing -- and they've said that it's not, that negotiations

4    and internal deliberations, and drafts are off the table.

5          We're going to go back, and we're going to go see

6    which executed agreements we need negotiations, drafts and

7    internal communications about from -- from Plaintiffs

8    themselves.

9          They've made abundantly clear, even in the exhibits

10   that were attached to their brief, Your Honor, that they view

11   that as irrelevant, not proportional to the needs of the case,

12   and overly burdensome.

13         The same is true for Pfizer.  It doesn't matter how

14   big we are.  You know what?  We are big.  We've also produced

15   more documents than any other entity in this case.  We've got

16   more custodial sources than any other entity in this case, and

17   we've been working really hard on discovery.

18         I told you about our investigation into this issue.

19   We've told Plaintiffs about our investigation into this issue

20   and the burden that it causes.

21         The notion that this type of information is so

22   relevant is sort of belied by the fact that Plaintiffs, again,

23   have cited no cases where a court compelled production of even

24   patent license agreements.  They haven't found any cases where

25   there was a compelling of negotiation documents and internal

1    deliberations related to patent licenses, let alone even

2    further far afield here, which is a supply agreement, and a

3    sales agreement, and a manufacturing agreement with the United

4    States government, which is wholly different than what is

5    going to happen in a hypothetical negotiation with the

6    Georgia-Pacific factors.

7              Here, the party -- one of the parties is the United

8    States government.  That's different than a private party.

9    This was negotiated during a global pandemic.  This is not

10   related to licensing of patents in any way.   The United

11   States government had different bargaining power.  There was a

12   massive number of donated doses involved in this -- in these

13   contracts.

14             The executed version provide what the economic value

15   was to both parties.  It's the executed version.  It's not

16   what led up to it and what might have been said between the

17   parties.  It's what actually happened.

18             THE COURT:  Okay.

19             MR. CERRITO:  Your Honor, if I might, just one

20   second?

21             THE COURT:  Go ahead, Mr. Cerrito.

22             MR. CERRITO:  On that last point --

23             THE COURT:  I know there's a lot there.

24             MR. CERRITO:  Just on the last point.

25             THE COURT:  So I'll violate my own sequencing.

```
 1              MR. CERRITO:  Yeah, and --

 2              THE COURT:  Go ahead.

 3              MR. CERRITO:  Yeah, the letter that they've referred

 4    to to rebut the statement that they've made plain and clear

 5    that they think the communications are relevant, they cite to

 6    another document, which is -- talks about their intent.  Their

 7    intent is not an agreement.  It just is what they intend to

 8    do.  It's not an agreement.

 9              And as to the uniqueness of this situation, you're

10    right, it was a global pandemic.  It was crazy times, no

11    doubt, for all of us.  But they elected to choose to drop the

12    price of what they said, the CEO of the company said it was

13    worth, to much less value.

14              Yes, they didn't get -- the Government got the

15    benefit of that clearly, but Pfizer did, too.  And that's what

16    we want to see.  Why did they do that?  What was the benefit?

17    How would that have played into a reasonable royalty had we

18    been sitting at the table with them?  That's what we need to

19    do.

20              And by the way, on the discovery, we gave them the

21    documents.  So I am happy to have reciprocal discovery.

22              Thank you, Your Honor.

23              THE COURT:  Okay.  Thanks, folks.

24              So, Ms. Horton, you will send the documents that you

25    referenced.  We'll get a copy of the transcript.  I will
```

1    front-burner this; I know you've been very patient.  And then

2    we'll determine what has to happen next.

3           Anything anyone else wants to share?  Not on the

4    argument, but just in terms of moving forward.

5           MS. WALSH:  Yeah, Your Honor.

6           THE COURT:  Yes?

7           MS. WALSH:  This is Liza Walsh.

8           THE COURT:  Yes.

9           MS. WALSH:  I think guidance would be very helpful

10   to us going forward, whether or not we should be complying

11   with the Local Rule of not attaching exhibits, or you would

12   just prefer us to bypass that, and actually attach the

13   exhibits.  Because --

14          THE COURT:  When you --

15          MS. WALSH:  -- as the discussion revealed -- I'm

16   sorry, Judge.

17          THE COURT:  My suggestion (Indiscernible - multiple

18   speakers).  Sorry.

19          MS. WALSH:  As the discussions revealed today --

20          THE COURT:  Yeah, go ahead.  I'm sorry.

21          MS. WALSH:  No, it's okay.  Go ahead.  I made the

22   point.

23          THE COURT:  Okay.  My suggestion would be if you put

24   in the body of the letter, and toward the beginning, just

25   noting that you're going to be referencing documents, and then

1    ask whether the Court wants to have them submitted.  And if

2    you could also give us an estimate -- whether you want us to

3    review them via email or upload it on the docket.

4           My hesitance with uploading items on the docket, as

5    you know, is that then you have to go through the whole

6    sealing process.  And just big picture, my approach is, and

7    has always been, to deal with issues as informally as

8    possible.

9           But if a record needs to be maintained for appeal

10   purposes, or any other purpose, I will work with you to make

11   sure that the docket has everything that you folks need for

12   whatever issue you have, and that you want to raise.  But I

13   try to avoid having you go through the requirements of

14   uploading documents, sealing documents.  It's a lot of extra

15   work where it may not, you know -- they may not ever need to

16   be part of the official record.

17          So, that's a very, again, long-winded way of saying

18   if you just would highlight for me that there are relevant

19   documents, and either they're on the docket, which obviously

20   makes that request somewhat moot.  But how would I like to

21   review them, it's at all.  Good?

22          MS. WALSH:  That sounds --

23          THE COURT:  Does that work?

24          MS. WALSH:  Yeah.

25          THE COURT:  Okay.

 1              MS. WALSH:  Yeah, that works.

 2              THE COURT:  Okay.

 3              MS. WALSH:  The next time, we won't put it in a

 4    footnote.  We'll put it in the beginning of the letter.  But,

 5    thank you.

 6              THE COURT:  Yeah.  I always reference our former

 7    Justice Clifford has a quote that he doesn't like footnotes.

 8    This is not a criticism.  I just use this with my class at

 9    Seton Hall just to consider.  He doesn't like footnotes

10    because he views it like having to run down during the first

11    night of your honeymoon to answer the doorbell.  It's a

12    distraction, and blah, blah, blah.

13                        (Laughter)

14              THE COURT:  It's very humorous.  But anyway, so

15    that's my defense for why, in my opinions, I try not to do

16    footnotes, even though all the smart people do footnotes.

17    Okay.

18              MS. WALSH:  No, it's a good -- it's a good practice.

19    Thank you.  And thank you for the guidance.

20              THE COURT:  Okay.  Mr. Cerrito, anything on your

21    mind?

22              MR. CERRITO:  No, Your Honor.  Thank you for your

23    time.  I appreciate it.

24              THE COURT:  All right.  Thanks so much, guys.  And

25    again, I will, front-burner this.  If you haven't heard from

1    me and you want to nudge me, feel free to send in an email

2    that just says, you know, "SOS" or "what's up" and "the judge

3    said I could do this."  So I won't yell at you.

4              Okay.  Good.  Thanks, folks.  Be well and to be

5    continued.  Take care.

6              MS. WALSH:  Thank you, Your Honor.  Thank you for

7    your time.

8              THE COURT:  Appreciate it.

9              MS. WALSH:  Thank you.

10             MR. DENI:  Thank you, Your Honor.

11        (Whereupon, at 10:52 a.m., the hearing was adjourned.)

12

                        CERTIFICATE OF TRANSCRIBER
13

14        I, KAREN HARTMANN, a certified Electronic Court
     Transcriber, certify that the foregoing is a correct
15   transcript from the electronic sound recording of the
     proceedings in the above-entitled matter.
16

17
     _/s/ Karen Hartmann_           Date: August 14, 2025
18   Karen Hartmann, AAERT CET 475
     TRANSCRIPTS PLUS, INC.
19

20

21

22

23

24

25