1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY
2                          TRENTON DIVISION

3

        ARBUTUS PHARMA CORP.,       ) Case No. 3:23-cv-01876-ZNQ-TJB
4       et al.,                     )
                                    )
5                     Plaintiffs,   ) Courtroom No. 6E
                                    ) Clarkson S. Fisher Building
6       versus                      ) & U.S. Courthouse
                                    ) 402 East State Street
7       PFIZER INC., et al.,        ) Trenton, New Jersey 08608
                                    )
                                    ) October 17, 2025
8                     Defendants.   ) 11:30 a.m.

9

10                  TRANSCRIPT OF DISCOVERY HEARING
              BEFORE HONORABLE TONIANNE J. BONGIOVANNI
11                 UNITED STATES MAGISTRATE JUDGE

12      TELEPHONIC APPEARANCES:

13      For the Plaintiffs,      Midlige Richter LLC
        Arbutus Pharma Corp.     By:  JAMES S. RICHTER, ESQ.
14      and Genevant Sciences    645 Martinsville Road
        GmbH:                    Basking Ridge, NJ 07920
15
        For the Plaintiff,       Morrison & Foerster LLP
16      Arbutus Pharma Corp:     By:  ADAM R. BRAUSA, ESQ.
                                 425 Market Street
17                               San Francisco, CA 94105-2482

18

        ESR/Courtroom Deputy:    John Moller
19
        Transcription Service:   Transcripts Plus, Inc.
20                               435 Riverview Circle
                                 New Hope, Pennsylvania 18938
21                               Telephone:  215-862-1115
                                 E-mail: CourtTranscripts@aol.com
22

        PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING. TRANSCRIPT
23                 PRODUCED BY TRANSCRIPTION SERVICE.

24

25

```
 1
     TELEPHONIC APPEARANCES:
 2   (Continued)

 3   For the Plaintiff,       Quinn Emanuel Urquhart & Sullivan LLP
     Genevant Sciences GmbH:  By:  F. DOMINIC CERRITO, ESQ.
 4                            295 5th Avenue, 9th Floor
                              New York, New York 10016
 5
     For the Defendant,       Walsh Pizzi O'Reilly Falanga LLP
 6   Pfizer:                  By:  LIZA WALSH, ESQ.
                                   LAUREN RUTH MALAKOFF, ESQ.
 7                            3 Gateway Center
                              100 Mulberry Street
 8                            15th floor
                              Newark, NJ 07102
 9
                              Willkie Farr & Gallagher LLP
10                            By:  AMANDA MAXFIELD, ESQ.
                                   SARA T. HORTON, ESQ.
11                                 AMANDA MAXFIELD, ESQ.
                              300 North LaSalle Drive
12                            Chicago, IL 60654-3406

13   For Defendant,           Gibbons PC
     BioNTech SE:             By:  WILLIAM DENI, ESQ.
14                            One Gateway Center
                              Newark, NJ 07102
15
                              Winston & Strawn, LLP
16                            By:  IVAN POULLAOS, ESQ.
                              35 W. Wacker Drive
17                            Chicago, IL 60601-9703

18
     (Additional attorneys may have been attending the hearing,
19   although no oral appearance was placed on the record)

20                                     ***

21

22

23

24

25
```

```
 1          THE COURT:  Okay.  We're on the record, and the
 2  docket number is 23-1876.
 3          Who's going to be speaking primarily, if there is
 4  such a thing, for the Plaintiff?
 5          MR. CERRITO:  I will be, Your Honor; Nick Cerrito
 6  from Quinn Emanuel.
 7          THE COURT:  Okay.  And then for the Defendant?
 8          MS. HORTON:  Hi, Your Honor; Sara Horton.
 9          THE COURT:  Okay; great.
10          So I just have an intro question that the submission
11  -- the most recent submission or the last submission from the
12  Plaintiff in response to the Defendants' offering of Mr.
13  Hering's documents, the Plaintiff mentions that there hasn't
14  been a production of internal pricing documents, or pre-launch
15  profit projections, or committee meeting notes, which are
16  responsive to other RFPs.
17          Does that mean there are other issues that are
18  percolating?
19                      (Pause)
20          THE COURT:  Anyone?
21          MR. CERRITO:  Short answer to that, Your Honor, is
22  maybe.  There is still some back and forth.  I mean, as you
23  can -- I think you have just identified, some of these issues
24  are intertwined.  So it depends, I guess, is one way to say
25  it.
```

1           THE COURT:  Okay.  Again, I'm -- of course, I care

2    about you, but I care about my life and what's coming.  And

3    also, you know, not to be flippant, candidly, but how I am

4    impacting your schedule, especially in light of the fact that

5    we have a decision on the Markman.  So remind me before we

6    wrap up to have a game plan of what remains, and then what the

7    next step should be.

8           So let me also then ask just, Pfizer, have the

9    documents -- Mr. Hering's documents been produced?

10          MS. HORTON:  Yes, Your Honor, we've produced more

11   than 46 hundred documents from Mr. Hering's custodial files,

12   including 500 documents, or so, between Pfizer and the

13   Government with regard to the negotiations.

14          THE COURT:  Forty-six hundred documents?

15          MS. HORTON:  Yes.

16          THE COURT:  Okay.  And how many pages is that,

17   about?

18          MS. HORTON:  I don't have that stat.

19          THE COURT:  Okay.

20          MS. HORTON:  But it would be more than 46 hundred.

21          THE COURT:  Okay.  And describe --

22          MS. HORTON:  So -- they're voluminous.

23          THE COURT:  Describe for me the -- what they entail

24   and how they were gathered, just -- I want to have a better

25   understanding.

1          MS. HORTON:   Sure.   So Mr. Hering's custodial files

2   were gathered, as in the normal course for Pfizer discovery

3   procedures.   We implemented the search terms that the parties

4   had previously agreed upon before substantial completion of

5   document discovery.   And then we added certain terms that we

6   thought would be beneficial based on the discussions the

7   parties had been having about certain topics that Plaintiffs

8   felt were not adequately provided in our previous production.

9   We did that.   We collected the documents, searched, reviewed,

10  and produced.

11         That Mr. Hering was, you know, North American

12  Regional President of Vaccines.   He was Global mRNA Business

13  and Franchise Lead.   He was a primary contact between Pfizer

14  and the United States Government during the time frames that

15  Mr. Cerrito mentioned the last time we spoke were most

16  important to Plaintiffs, which is the time frame leading to

17  the 2020 agreements where the price was, as he said last time,

18  was high -- was discussed as being potentially more valuable,

19  then went lower in the executed agreements, which had already

20  been produced.   He was on these documents, and in these

21  negotiations.

22         These documents include also not just the back and

23  forth with the Government, but also internal documents related

24  to COMIRNATY, or the vaccine I will say, pricing, and sales,

25  and associated negotiations, which is what we understood the

1    Plaintiffs to be seeking in their RFPs, and also in their

2    motion to compel that was filed this summer.

3            THE COURT:  Okay.  When were the documents produced?

4            MS. HORTON:  That is an excellent question that I

5    should have an answer to.  I want to say a couple of weeks

6    ago.  Not more than two weeks ago, maybe.  I'm sure Mr.

7    Cerrito would know --

8            MR. CERRITO:  That --

9            MS. HORTON:  -- if I get that wrong.

10           MR. CERRITO:  That -- that's accurate, Your Honor.

11           THE COURT:  Okay.  And, Mr. Cerrito, I understand if

12   your team has not been able to read every single page, so I'm

13   not focusing right now on the substance of what's included,

14   but you had some objections to the proposal when initially

15   made just on paper.  And I wanted to understand, it had

16   something to do with the scope, the time, and also -- is that

17   right?

18           MR. CERRITO:  Yeah, let me -- and if I might, Your

19   Honor, let me set the stage a little bit.

20           THE COURT:  Sure.

21           MR. CERRITO:  Mr. Hering was offered-up on a wholly

22   different subject matter, not what we're here to talk about

23   today.  He was offered-up as a compromise on pricing issues.

24   And so cleverly, I believe, Defendants tried to avoid this

25   issue by sneaking a letter in to you without waiting a

1    response from us, and saying, "Oh, this is moot.  We're done."

2    It most certainly is not moot.  It most certainly is not

3    done.

4            The problems with Mr. Hering are numerous, including

5    the fact that -- remember, we're seeking four agreements.  He

6    was not even present at the company any longer for two of

7    them; could not possibly be relevant to those two documents --

8    to those two agreements.

9            He also is only one person in this chain of events.

10    And from what we've seen in our initial review, there's many,

11    many other people involved.  He was not somehow the only one

12    and the important one, the one that ends-all, bes-all.  It is

13    not the case.

14            When you look at the substance -- and, again, we

15    haven't been through every page, every line.  But when you

16    look at the substance of the documents, we're not seeing a lot

17    of things.  And it doesn't surprise me, and I'll get to why it

18    doesn't surprise me.

19            But remember, we talked about Dr. -- Mr. Bourla, the

20    President, talking about in his book, "Oh, you know, we could

21    have charged $600, but we didn't.  We're good people.  We got

22    other non-monetary value for dropping the price down."

23            Well, what we're seeing is fundamental -- not seeing

24    is fundamental things like, how did they even -- where did

25    that 600 number come from?  Where did the -- they dropped the

1    number down -- again, he talks about dropping it down to $200.

2    Where did the -- where did that come from?  We're not seeing

3    any proposals or any analysis of how they're generating that

4    number, or what that number was based upon.

5         We have absolutely no documents that we've seen so

6    far that talk about the reasoning why they took it down from

7    the 200, assuming that was the next step, down to the nineteen

8    fifty.  I mean, these are the documents that we need to see to

9    understand the non-monetary value that they received from

10   these agreements.

11        There is one document, interestingly, talking about

12   Mr. Hering.  There was some discussion about dropping the

13   price to $115.  But ironically, Mr. Hering was not involved in

14   and, in fact, was specifically not asked for his view on that

15   particular price drop.

16        So, when I say he wasn't even available for two of

17   the three -- two of the four agreements, he's certainly not

18   the only one.  There was a lot of people involved.  None of

19   these documents, so far, get to the heart of the numbers that

20   we're talking about.  And the reason we're saying that, they

21   gave up a lot of non-monetary value.  And that value, we can

22   try to recoup in a reasonable royalty, but we're not seeing

23   the basis here.

24        Again, I thought it was a little, you know -- I

25   don't want to be too derogatory to my friends here.  But, you

1   know, slipping that in at the last minute, after giving the

2   Court 10 documents of why there was an agreement, clearly

3   there was no agreement.

4        Then they say, "Oh, don't worry about it.  Here's

5   this guy" -- who, by the way, they didn't mention was in

6   response to a wholly different category -- "and he's okay.

7   This will solve everything."  It most certainly does not solve

8   it.   There's a lot that we haven't seen.  A lot that we're

9   missing here, and he isn't the answer for this.

10        And for all the reasons that we argued originally,

11   we should receive discovery on this.  It's a fundamental basic

12   principle on understanding what the true value of this -- our

13   inventions were, and what they would have paid in a reasonable

14   royalty.  So, Mr. Hering does not solve that problem.

15        THE COURT:  Okay.  Let me just mention the, I guess,

16   the elephant in the room of whether there was an agreement or

17   not, and it's not my intention today to rule upon that; I want

18   to have the fallback.  If there's no agreement, let's address

19   the substance of the issues.

20        But I want to comment that, of course, the parties'

21   agreement is sacrosanct.  I think that's the way the Court

22   views it.  We enforce our meet and confer policy, and you

23   folks, through the ages, have been able to work out your

24   arrangements, and spending -- especially here, I can see from

25   just the minute amount of paper that has been submitted in

1    connection with just this dispute, that you have spent a

2    phenomenal amount of time, energy, put thought into it, with

3    the notion that you're avoiding Court intervention.  So that

4    process, I don't want to undermine it in any way, and I am

5    going to focus on whether or not I think there is sufficient

6    information here to establish an agreement.  And recognizing

7    that if I just said basically, "not a big deal to reopen, I'm

8    just going to ignore whether or not there was an agreement

9    that seems to have been reached, and just deal with the

10   issues," I think that undermines the entire process and does a

11   disservice to all of you.

12          That said, I can do, I think, a Venn diagram on your

13   various positions.  And for today's purposes, I wanted to

14   focus on the substance, rather than the time frame and your

15   various positions.

16          The only comment/question I have, it does seem that,

17   at various times, both sides have taken opposite positions.

18   Both sides have said, "We want communications."  And then both

19   sides seem to have said, "They're not necessary to this

20   issue."  Am I wrong?

21          MR. CERRITO:  Can I --

22          THE COURT:  Yeah.

23          MR. CERRITO:  Your Honor, yeah, you're -- you're

24   exactly right.

25          MS. HORTON:  Yes.

1            MR. CERRITO:  And let me tell you why, and maybe

2    it's something -- I apologize for not explaining better the

3    first time we did this.  What you're seeing is an asymmetry of

4    positions here.  What I mean by that is, each party was asking

5    -- let's just call them negotiation documents, so I don't have

6    to repeat the whole sentence every time.  Each party was

7    asking for negotiation documents:  Plaintiffs, the Government

8    negotiations so we can talk about reasonable royalty and

9    things like that.

10           Defendants were asking for them on our patent

11   licenses, so Plaintiffs' patent licenses.  They wanted to see

12   what went into that to see what we valued the patents at.

13   Each side was asking for that.

14           And what you -- and, by the way, quite

15   coincidentally, the document request numbers are almost

16   identical.  Well, 61 -- they both go -- so you're seeing back

17   and forth on the same negotiation documents, two different

18   issues, going at the same time.

19           What happened early on -- and this is why I'm

20   responding to your point, which I think is an excellent one.

21   What was happening was Plaintiffs said, "Look, this is getting

22   crazy," early on, and said, "why don't we both just produce

23   final agreements?"  That's where this whole thing started.

24           Defendant -- Plaintiff -- Defendants said, "We're

25   going to produce our final agreements.  But no, no, no, we

1    want your negotiation documents."  That's what you're seeing

2    back and forth the whole time.  That's why you keep seeing

3    Defendants say, "Yeah, we'll give you our negotiation

4    documents only."  They didn't want to -- I mean, sorry.  Only

5    the final agreements only.  But there was never agreement

6    because each side wouldn't agree to either give everything or

7    only the finals.  That's what you're seeing here.  That's why

8    there was never an agreement.

9         That's why they had to put in 10 documents to Your

10   Honor, 10, to show, quote-unquote, "an agreement."  If it was

11   so simple, they'd put in one, and they'd say, "Here it is."

12   You know, Your Honor, you've been doing this a long time.

13   You've seen these agreements before.  They would have a

14   memorialization after every -- after meet and confer, we have,

15   every moment, "Here's what we've talked about."  "Here's what

16   we agreed to."  It would be plain and simple.

17        It's not because you're seeing an asymmetry here.

18   The asymmetry is Defendants only wanted to give final

19   agreements, but not the negotiation agreement.  And the

20   Plaintiffs said, "No, that's not the way this works.  We

21   either both give them or we both don't."  And it was never

22   agreed to.

23        Now, as it turns out, we ended up giving some

24   documents on our negotiations, regardless.  So they have them.

25   So at least for that purposes, there should be a symmetry, and

1   we should get the same documents from them.  Obviously, two

2   different issues, but I -- I believe that's where the

3   confusion is.

4           THE COURT:  So one of the things that is quoted by

5   the Defendant is the Plaintiff saying that producing such

6   documents, drafts, and negotiation communications would be

7   unnecessarily burdensome.  And then I did hear you just say

8   that you've produced some communications, but I gather not

9   all.  And --

10          MR. CERRITO:  Well, what -- I just didn't want to

11  say all because I don't know, and I don't want to make a

12  misrepresentation to the Court.

13          Yeah, that's what you were seeing.  When we realized

14  there was no agreement, we started producing things.  Things

15  went through.  What we keep -- we kept trying to get that deal

16  done; they wouldn't accept it.  They wanted more.  They wanted

17  those negotiation documents, and it wasn't going to be one

18  way.  It could not have been one way, that's why there was

19  never an agreement.

20          THE COURT:  Okay.  Ms. Horton, I know that I

21  prefaced this section with saying I wasn't really going to get

22  involved in a discussion, but I've opened that door.  So

23  anything you'd like to say on this topic, agreement/no

24  agreement?

25          MS. HORTON:  Sure.  To the point that we submitted

1    10 documents, Your Honor, that -- we did that because that's

2    what we said we would do during our last call on the 6th.  I

3    don't know that we needed all 10 documents in order to show

4    the agreement, but we sent them to you because that's what we

5    said we would do on the call.  So that was the reasoning for

6    that.  It has nothing to do with needing to have done that.

7    It's just because we told Your Honor we would, to give you the

8    full scope, and we did.

9              I think it's very clear in the March 28th email that

10   we've submitted that was missing from Plaintiffs' submissions

11   before the August 6th hearing, that there was a question about

12   whether or not we would produce drafts and negotiations that

13   have been going back and forth with these issues since 2023.

14   Okay?  So we had been discussing this in sort of a symmetrical

15   way.  "Will you give us drafts and negotiations?"  "Will you

16   give us drafts and negotiations?"

17             And as Your Honor just noted, Plaintiffs were taking

18   the position that that was overly burdensome, not relevant,

19   all of these things.

20             We answered the question about whether or not we

21   would produce drafts and negotiations saying, "No, nobody

22   needs to do that."  We will -- it's in the 28th email; I will

23   find it.  We said, "Defendants intend to produce executed

24   agreements related to the development of the lipid

25   nanoparticle components of the accused products and

1    manufacture, sale, and distribution of the accused products,

2    to the extent they can" -- I'm sorry -- "to the extent they

3    exist and can be located after a reasonable search.  Such

4    agreements may be subject to obtaining permission of third

5    parties," which means the Government here, and that was the

6    answer to their question.  That's what we did.  That's what

7    they did.

8         To the extent things went through, as Mr. Cerrito

9    just said, that's because of ESI protocols.  We did that, too.

10   They had negotiation documents and other things that slipped

11   through because we didn't withhold them after we had collected

12   them.  Right?  If they were responsive, they got -- they went

13   through.

14        But that doesn't mean that -- I don't think Mr.

15   Cerrito is representing that they've produced all of their

16   negotiations and internal communications about their patent

17   licenses.  We know they haven't.

18        And, in fact, some of the communications the parties

19   have had leading up to the August 6th hearing was, look, if we

20   don't have an agreement on this, which Defendants think that

21   we do, we're going to have to go back and take a look, harder,

22   at what else we want from you.  Because Plaintiffs have

23   agreements where they do actually value the patents.  That's

24   relevant to a reasonable royalty.

25        What we're talking about here is Government

1    contracts where they have the executed agreements, and they

2    also have all the underlying financial information:  How many

3    vaccines were sold; where they were sold; the P&Ls related to

4    everything.  They have all the financial documents that

5    underlie those executed agreements.

6           If we are going to reopen discovery as to drafts and

7    communications, then, yes, Defendants will be looking for the

8    same type of information from Plaintiffs.  And we're not there

9    yet, Your Honor, because we do believe that the parties did

10   have an agreement that that was going to be out of bounds.

11          The reasoning for us producing Mr. Hering's

12   documents, one, I'm not sure it really matters.  We were doing

13   it to try to avoid disputes and to try to come to compromises

14   so that we wouldn't be back here again, Your Honor.

15          We've produced yet another custodian.  Pfizer has

16   now produced 13 custodians.  That's the same number as both

17   Plaintiffs combined.

18          We've produced, as Defendants grouped, I think seven

19   times more pages of documents than Plaintiffs have.  This is

20   not a situation where Defendants have been shirking their

21   discovery obligations.  We have been responsive to any issues

22   that they bring up.  We have investigated.  And, in certain

23   instances, even though we don't think we need to, we don't

24   think it's proportional, we don't even think that it's

25   relevant, as parties do in these things, you sometimes

1    compromise and produce.  And that's what we've done here with

2    Mr. Hering, who is -- who I haven't heard the Plaintiffs say

3    he's the wrong guy.

4         Maybe he's not the entirety of everyone who

5    negotiated some aspect of the Government contracts within

6    Pfizer.  But, of course, that's not what discovery requires.

7    That's not what this District requires.  That's not what Rule

8    26 requires.  That's not what the ESI protocol requires.

9         We've already gone above and beyond all of those

10   things.  So now they have extra documents, and I guess I hear

11   them asking for more.

12        With regard to whether or not we needed to produce

13   other things related to -- there's four contracts with the

14   Government.  We've produced -- I take it they agree we've

15   produced for the first two.  They're saying we haven't for the

16   second two.  I haven't heard any reasoning in any of the

17   papers as to why those third and fourth contracts provide

18   relevant, and discoverable, and proportional information.

19        Look, setting aside whether or not there's agreement

20   that we wouldn't produce this stuff, so setting that aside,

21   all of the arguments from Plaintiffs with regard to why this

22   information might be relevant to their damages analysis

23   relates to what the price was at the beginning that they say

24   is in our papers or in our CEO's book, and then what it was

25   sold for.  And that happened in the first Government contract

1    in the summer of 2020.

2            I don't know why additional documents related to

3    internal processes, or negotiations with the Government, or

4    drafts with the Government of things that happened in 2022 are

5    proportional to the question that we're answering here today.

6            MR. CERRITO:  Your Honor, may I respond briefly?

7            THE COURT:  Yeah, sure.  Go ahead.

8            MR. CERRITO:  I would just ask counsel, through Your

9    Honor, show me the document that says an agreement.  Show me

10   the one document.

11           She pointed you to the April -- the March

12   communication, which I think was her Exhibit 8.  If you look

13   at Exhibit 9, which is their April 30th communication, that

14   exhibit still talks about us -- "us," Plaintiffs -- asking for

15   the negotiation documents.  If we had an agreement, why are we

16   still asking for them?  Because there was no agreement.

17           I think I heard, again, that somehow we've agreed

18   that we're okay with the first two agreements.  It's

19   absolutely false.

20           Was -- Mr. Hering's the right guy.  I don't know,

21   because I haven't seen the other documents that they should

22   produce.  He might be.  He might not be.  I know he's missing

23   a ton of stuff that we would expect to see.  He is not the

24   one.

25           THE COURT:  Like what?

```
 1              MR. CERRITO:  He may be a --

 2              THE COURT:  Like what?

 3              MR. CERRITO:  Well, like I said, Your Honor, we have

 4    no indication, nothing in there talks about how they -- I'll

 5    start backwards.  How did they arrive at the nineteen fifty

 6    number?  How did they arrive?  I have no idea.  There's no --

 7    they put their -- I think their normal processes go through a

 8    pricing analysis.  I haven't seen that.

 9              Where did they -- how did they go from 600 to

10    nineteen fifty?  I don't know.  How did they go from 200 to

11    nineteen fifty?  I don't know.  They haven't produced anything

12    when it comes to that

13              So, no, we don't have an agreement on the first two

14    documents.  This is the third time Defendants are trying to

15    slip it in that we -- that somehow, we have an agreement.

16    Let's be clear, we do not have an agreement.

17              And the fact that Pfizer, one of the largest

18    pharmaceutical companies -- the largest pharmaceutical company

19    in the world, and with regard to one of the largest selling

20    drugs in the world ever, had a lot of documents?  Yeah, I

21    expect they would.  They should have a lot of documents.  So

22    I'm not -- I'm not impressed that counsel has some number

23    situation on her behalf.  It is what it is.

24              At the end of the day, there was no agreement.  He's

25    not the right man.  It doesn't end this dispute.
```

1              And why do I need -- I think, just to address her

2    last point.  Why do I need -- on the third and fourth

3    agreement?  Well, if you look at the third and fourth

4    agreement, their price dropped again.  It went from nineteen

5    fifty to six seventy-five.  Six dollars and seventy-five

6    cents.

7              And with regard to the fourth agreement, it was --

8    some doses were at $28.  Some doses were at 45.  Again,

9    there's a -- we need some basic understanding how this

10   happened.  And what was the non-monetary value they were

11   assuming for all this?  That goes into what a reasonable

12   royalty analysis is.  Georgia Pacific factors, the Asetek case

13   that we cited, it's all relevant.

14             THE COURT:  Okay.

15             MR. CERRITO:  We simply want that.

16             THE COURT:  I just want to make sure I understand

17   the landscape.  That, first of all, all of this goes to

18   damages.  And there's monetary and non-monetary damages.  So

19   far, we've been focusing on the monetary damages, regarding

20   pricing, etc.  And I know that in the papers, you mentioned

21   that there's goodwill, etc.

22             But if Defendant is producing -- and I realize

23   you're still in the negotiation stage.  And I also understand

24   that there is often an overlap between requests for

25   production.  But the most recent comments that -- you know,

1   you talk about internal pricing, and the pre-launch

2   projections, and committee notes.  So it seems to me that the

3   information the Defendant -- I'm sorry, the Plaintiff is

4   seeking would be within those documents.  So, Ms. Horton, is

5   that so?  Are you producing that information?

6               MS. HORTON:  Your Honor, we believe we have, based

7   on our -- I'm sorry.

8                         (Telephone ringing)

9               MS. HORTON:  I don't know who this person is that's

10  calling me.  I'm sorry if you can hear that, but I can't --

11              MR. CERRITO:  It was me.

12              THE COURT:  That's okay.

13              MS. HORTON:  -- turn it off --

14              MR. CERRITO:  It was me, I was pranking her, Your

15  Honor.

16                            (Laughter)

17              THE COURT:  Yeah, he's --

18              MR. CERRITO:  I was calling her from --

19              THE COURT:  He's trying to distract you.

20              MR. CERRITO:  Yeah.

21              THE COURT:  He's trying to distract you.

22              MR. CERRITO:  Take every advantage I can, Your

23  Honor.  Every advantage I can.

24              MS. HORTON:  I have all the telephones turned off.

25  I didn't -- didn't -- I guess I don't know how to actually

1    mute my office phone.

2             Your Honor, I'm sorry.  The question about other

3    pricing documents.

4             THE COURT:  Yes.

5             MS. HORTON:  Yes, there were separate communications

6    that are not at issue in the briefing before Your Honor about

7    production of other documents, and committee notes, and other

8    projection documents, which, yes, we have produced documents

9    related to those things.

10            THE COURT:  Okay.  So within those documents, I'm

11   gathering that there is, at least, some of the information

12   that the Plaintiff is seeking a discussion about pricing, and

13   then obviously the actual prices.

14            MS. HORTON:  Correct.

15            THE COURT:  Is that so?  Okay.

16            MR. CERRITO:  No, Your Honor, what you see is the

17   actual prices.  You don't see how they got there.  You don't

18   see how they say, Mr. Fering [sic], by the way -- his name's

19   coming -- in one of the documents says the economic value of

20   this is $10,000 a dose.  That's what he said.  That's the one

21   document I found interesting from him.

22            But we don't see how they get to the nineteen fifty.

23   How do they get to the six dollars and seventy-five cents?  We

24   have no idea.  We've -- you know, not gotten any of those

25   documents.

1          THE COURT:  Okay.  Let me get into the weeds or, to

2    use another, perhaps, better Jersey-based analogy, how the

3    sausage is made.  Can you give me, Ms. Horton, a tutorial in

4    what's the process for a company, your company, to make these

5    determinations on the marketability of a drug and then, more

6    importantly, of course, the pricing.  Is this -- you know, how

7    many layers are involved?  I can -- again, I can only imagine

8    it's --

9          MS. HORTON:  Your Honor, I'm not sure that I can.

10   I'm not sure that I can speak for Pfizer on this.  I think

11   that the hundreds of thousands of documents that we have

12   produced that could go to those issues -- we haven't had any

13   depositions in this case yet.  There are -- there are -- it is

14   a surprise to no one that during the 2020 time frame, after

15   the Government decided to work with Pfizer on this issue,

16   there were innumerable phone calls.  Right?  There were people

17   working with the FDA.  There were people working with HHS.

18   There were people working with the Army.  There were people

19   working on logistics.  There were people working, I mean,

20   all hours of the night as -- as -- in the book that Mr.

21   Cerrito keeps referencing, there's a discussion of the grand

22   effort that was put forward by Pfizer, and BioNTech, and,

23   frankly, the other companies who are working on vaccines at

24   the time.

25          And then on the other side of that is the Government

 1    itself.  Right?  We don't have all the internal Government

 2    communications about what they were seeking, or what they were

 3    doing, or what their side of the negotiation looked like,

 4    right?

 5          What I can produce to Mr. Cerrito is the person who

 6    signed the first contract, Mr. David Hering.  And I can give

 7    him the communications that go back and forth with the

 8    Government from him.  And that's -- that's what we've done.

 9          THE COURT:  But you haven't provided the

10    communications that were in-company between --

11          MS. HORTON:  Oh, yes, we -- I'm sorry.  We -- the 46

12    hundred documents that I mentioned, only 500 of those were

13    going back and forth with the Government.  I say "only" sort

14    of tongue-in-cheek because I feel like that's a lot of

15    documents that go back and forth to the Government on

16    negotiations, when we believe we didn't have to produce those

17    at all, and don't think Plaintiffs have with regard to their

18    licenses that actually value the patents.

19          So we're a layer removed of relevance to damages

20    here when we're talking about these Government contracts,

21    which are for manufacture and commercialization, not for the

22    patents.  They say nothing about the patents.

23          MR. CERRITO:  But they do --

24          MS. HORTON:  So, yes, we --

25          MR. CERRITO:  But there are no internal documents,

1    Your Honor.

2              MS. HORTON:  If I can --

3              MR. CERRITO:  There's no internal documents --

4              THE COURT:  Yeah, and actually, let --

5              MR. CERRITO:  -- talking about the price.

6              THE COURT:  Let me -- let me ask Ms. Horton a

7    clarifying question.  So, again, are there documents that

8    would have been shared or communications that would have been

9    shared with Mr. Hering about the pricing, rather than just the

10   ultimate number?  And I'm making another analogy.  I'm going

11   to place on the shelves a product, and back in the storeroom,

12   the powers that be are determining what that pricing should be

13   based on shipping, manufacturing, etc.  And then the sales or

14   a stock person is placing it on the shelf, and they're being

15   told this is what the price should be.

16             So as I understand, Mr. Cerrito wants to know all of

17   that backroom discussion.  And would that information be

18   within the communications that are shared with Mr. Hering?

19             MS. HORTON:  Your Honor, after a reasonable

20   investigation, we believe the answer is yes.  That's why we

21   chose him.

22             THE COURT:  Okay.

23             MS. HORTON:  I mean, his title alone, that he is the

24   North American Regional President of Vaccines at that time,

25   and then was the Global mRNA Business and Franchise Lead.  He

1    is -- he is involved.  He's in the room where it happens, to

2    use the Hamilton reference.

3              THE COURT:  Okay.

4              MR. CERRITO:  But --

5              THE COURT:  And then in terms of committee notes, is

6    there information in the committee notes or discussed by the

7    committees that relate to pricing?

8              MS. HORTON:  I don't -- I don't want to -- I think

9    so.  And I think we've produced those.  BioNTech and Pfizer

10   have produced various committee notes that we've searched for

11   and gathered, following some communications from Plaintiffs.

12   That is -- that's not in our papers before Your Honor, so I

13   want to be careful about what I say, but I think -- I think,

14   yes.

15             THE COURT:  And, again, just to really drill down,

16   and specifically where -- is this where the part of the

17   discussion, at least, would be had regarding pricing?

18             MS. HORTON:  I'm not sure that it would specifically

19   have been within those committees that Your Honor is speaking

20   about, but there are certainly internal Pfizer communications

21   that Mr. Hering was on that were produced that discussed that.

22   I just don't want to tie it specifically to a committee,

23   because I don't know what, you know, quote-unquote,

24   "committee" it is, or if it was just part of his job.

25             THE COURT:  Okay.  And let me just --

1           MR. CERRITO:  Your Honor --

2           THE COURT:  Yeah, let me just ask.

3           MR. CERRITO:   Okay.

4           THE COURT:  I want to clarify something before we

5      move on; I'm just looking at my notes.

6           There were requests -- and I'm just going to tick-

7      off four areas, and I want to understand what the landscape is

8      in these four areas.  I think what Plaintiffs sought were

9      executed patent licensing agreements, and I'm -- all of this

10     applies to the accused product.  And the note was that they

11     would be produced, but permission was required by the third

12     party, you know, mainly -- I guess, only the U.S. Government.

13     Was anything withheld because you did not receive Government

14     approval or third-party approval?

15          MS. HORTON:   Just -- Your Honor said "patent

16     licenses," and I want to clarify because I think it's -- we're

17     talking about the Government contracts.  But if the question

18     is with regard to the Government contracts, we did not

19     withhold anything based on lack of Government permissions for

20     these two --

21          THE COURT:   Okay.

22          MS. HORTON:   For this production.

23          THE COURT:   And then executed agreements that

24     involve the development of, I guess, for -- the initials are

25     L.P.N., and various places, the request is for components,

1    technology, therapeutics, and it's broad as to the sale,

2    manufacture, distribution, in addition to the development,

3    also potentially third-party permission may be sought.  So has

4    -- to your knowledge, all of that has been produced?

5            MS. HORTON:  To my knowledge, all of that has been

6    produced, and there is no outstanding disputes about the scope

7    of that.

8            With regard to the third parties there, I want to be

9    careful.  There has been one third party, at least, with

10   regard to a license where the parties have separately agreed -

11   - and I think Mr. Cerrito will agree with me that the parties

12   have agreed on this one to have special outside counsel's eyes

13   only permissions for one of the licenses that have been

14   produced.  I don't remember if it's by Pfizer or BioNTech, or

15   maybe both.  But I think -- I think that that's been the

16   permissions there.

17           THE COURT:  Okay.

18           MR. CERRITO:  I think --

19           THE COURT:  Is that right, Mr. Cerrito?

20           MR. CERRITO:  I think that might actually be an

21   agreement, yes.

22           THE COURT:  Okay.  Two more.  One has to do with

23   agreements that demonstrate royalty payments made or received.

24           MS. HORTON:  Yes, we've produced royalty statements.

25           THE COURT:  Okay.  And then lastly, commercial

1    agreements with third parties relating to the payment or

2    financial commitment by the Defendant to develop or market the

3    accused product.

4         MS. HORTON:  Yes, Your Honor, I think that that is

5    wrapped up in what we've produced, as well.

6         THE COURT:  Okay.  And the next question I have,

7    moving off of the financial information, is there any

8    information, or perhaps identify what information, Mr.

9    Cerrito, you think is relevant to non-monetary information

10   that would impact royalties?

11        MR. CERRITO:  Yeah, so everything we've been arguing

12   about, Your Honor, essentially.  Let me take a step back to

13   your analogy, which I liked very much because it involved

14   sausage.  And as an Italian American, I'm a big fan.  Let's

15   take this -- back to Mr. Hering again.  I just got from my

16   notes -- I apologize for not mentioning it earlier.  This

17   joint committee that they were on about this pricing and

18   stuff, he was removed from that committee in May of 2020.  He

19   was also -- ultimately left the company.  I suspect it was

20   part of his way out.

21        So the backroom discussions you're talking about,

22   and how we get to that price, he's not involved in it at that

23   point.  We don't see any documents on that.

24        What I suspect happened — I'm just guessing at this

25   point — is that their CEO, Mr. Bourla, said, hey, this thing's

 1    worth -- I don't know how they got to 600, because we don't

 2    see those documents either.  But he's the one who made these

 3    decisions.  It may be in his documents, or he was the one who

 4    did it, whether it was verbal or otherwise, I don't know.

 5            But we don't see those backroom discussions.  We

 6    just see the end result.  And we want to understand why they

 7    said, "Okay, it was 600, but I'll take less because I'm

 8    getting this non-monetary value."  Maybe it's Mr. Bourla,

 9    maybe it's somebody else, but it's not Mr. Hering because we

10    haven't seen those documents.

11            THE COURT:  Okay.  Ms. Horton, anything else?

12            MS. HORTON:  Mr. Hering didn't leave in 2020.  He

13    left in May of 2021.

14            MR. CERRITO:  I understand.  I said he left the

15    committee that he was on in May of 2020.

16            MS. HORTON:  And the press releases about when he

17    left discuss how he managed and did such a great job with the

18    negotiations with the United States Government --

19            MR. CERRITO:  That's --

20            MS. HORTON:  -- which is also (indiscernible -

21    multiple speakers).

22            MR. CERRITO:  That's terrific.

23            MS. HORTON:  Your Honor, I -- I just wanted to note

24    that --

25            MR. CERRITO:  There's a lot of things, Your Honor,

1    that I do on behalf of my clients that I'm not involved in.

2    My -- my associates do a lot of things for me, and then give

3    me the end product.  I suspect that's what happened here.

4            THE COURT:  Okay.

5            MS. HORTON:  May I respond, Your Honor?

6            THE COURT:  Sure.

7            MS. HORTON:  What I'm hearing is that Mr. Cerrito

8    wants us to potentially go search for the CEO of Pfizer's

9    documents for this, and I don't think that is a request that

10   is on the table.  I also don't think that request is

11   reasonable.

12           THE COURT:  Okay.

13           MR. CERRITO:  Well, the request is for responsive

14   documents to our discovery.  How they get them and who they

15   get them from, it's not my doing.  That's theirs.

16           THE COURT:  Okay.  And just going back to the

17   pricing formulations that were the subject of other RFPs.  Ms.

18   Horton, I believe you said information has been produced.  Mr.

19   Cerrito, I think in the most recent letter, says still

20   waiting.  What is -- what else is coming, Ms. Horton, from

21   your client regarding the pricing, and the projections, and

22   any information or discussions regarding how to formulate a

23   price?

24           MS. HORTON:  Your Honor, this -- the last email or

25   communication from Plaintiffs to Your Honor on this topic was

1   in August.  Since then, we have produced all of these other

2   documents, including some other updates, at the request of

3   Plaintiffs, to other financial information.  Those have now

4   been completed.  We produced all of those earlier this month.

5   That's including the 46 hundred documents from Mr. Hering from

6   the 2020 and 2021 timeframe where this pricing discussion

7   would have been happening.

8              In addition to other updates of documents relating

9   to -- and to be fair, this is relating to more recent

10  information.  Right?  Because we've been updating under Rule

11  26 our financials, and P&Ls, and things like that related to

12  more recent vaccine sales.

13             THE COURT:  Okay.  It's going to seem completely

14  off-topic, but the complaint asks for a jury trial on all

15  claims that are so triable.  Is any of this a jury trial?

16             MS. HORTON:  Yes.

17             THE COURT:  Okay.  What claims or what counts?

18             MS. HORTON:  I should let Plaintiffs respond; I'm

19  sorry.

20             MR. CERRITO:  Yes.  Our claims for infringement are

21  absolutely triable to a jury.

22             THE COURT:  Okay.  And the damages calculation would

23  be made by the jury?

24             MR. CERRITO:  Yes.

25             THE COURT:  Ms. Horton, you agree?

```
1              MS. HORTON:  I think there would be a verdict form

2    with the -- yes, they would have to come to a number.

3              THE COURT:  Okay.  Yeah, because I was considering

4    punting if this were Judge Quraishi's trial, then come back to

5    me after the verdict.  But I can't do that.  All right.  I

6    think we can go off the record.

7              MR. CERRITO:  Your --

8              THE COURT:  Obviously, I'm still thinking about

9    this.

10             MR. CERRITO:  May I make one more comment, Your

11   Honor?

12             THE COURT:  Sure.

13             MR. CERRITO:  And it was something that, I guess,

14   you picked up, and I think actually where we're going to go in

15   the next step of this discussion is, we have our Markman now.

16   We're going to start digging into even more discovery.  And

17   depositions is really where I'm worried this is going to play

18   a big part.

19             THE COURT:  Of course.

20             MR. CERRITO:  Because we're going to get a witness

21   in the chair --

22             THE COURT:  I understand.

23             MR. CERRITO:  -- and we're going to say, "How did

24   you get to that number?"  And we're not going to have any

25   documents --
```

```
 1                    THE COURT:  Yeah.

 2                    MR. CERRITO:  None.

 3                    THE COURT:  I understand.  And what I try to do in

 4       every case is deal with the issues that are going to impact

 5       certainly the primary witnesses.  And I realize -- I haven't

 6       wrapped my head around this, nor maybe have you either, but

 7       there are going to be some witnesses who will be maybe just

 8       solely damages, or just slightly on damages, and perhaps you

 9       can start with those depositions.

10                    But my goal is always to try to resolve any of the

11       discovery issues before you start depositions so you don't

12       have to face a do-over or have a fight during the deposition,

13       and that really waylays your process of moving forward.

14                    So I think we can go off the record now.

15             (Whereupon, at 12:11 p.m., the hearing was adjourned.)

16
                            CERTIFICATE OF TRANSCRIBER
17

18          I, KAREN HARTMANN, a certified Electronic Court
         Transcriber, certify that the foregoing is a correct
19       transcript from the electronic sound recording of the
         proceedings in the above-entitled matter.
20

21
         /s/ Karen Hartmann         Date: October 23, 2025
22       Karen Hartmann, AAERT CET 475
         TRANSCRIPTS PLUS, INC.
23

24

25
```